UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BROOKE C. DELENCH
  Plaintiff

       V.

KIMBERLY ARCHIE
  Defendant

CIVIL ACTION NO.

COMPLAINT
(And jury demand)

NATURE AND BASIS OF ACTION

This is an action for defamation.

PARTIES

1.      Plaintiff Brooke C. de Lench ("Ms. de Lench") is an individual residing in Concord, Massachusetts.

1.      Defendant Kimberly Archie ("Ms. Archie") is an individual residing at 5376 Jasmine Street, San Bernardino, California 92407-2450.

JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction of this matter pursuant to 15 U.S.C. §1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Ms. de Lench and Ms. Archie are citizens of different states.

3.      This Court has personal jurisdiction over Ms. Archie in that her contacts in the Commonwealth of Massachusetts as she has intentionally availed herself of the laws and protections of the state, by, among other things, organizing and speaking at a cheerleading safety summit at the Omni Parker Hotel in Boston, Massachusetts on April 29, 2011; serving as an expert witness/consultant in a wrongful death suit filed in Middlesex Superior Court; attending and speaking at conference of trial lawyers in Boston on July 23, 2017 on the subject of brain injuries in football; sending the brain of her son, Paul Bright, Jr. ("Paul") to be autopsied by the Boston-based Concussion Legacy Foundation ("CLF") in 2015, encouraging others to donate their brains, or those of members of their family, to CLF for autopsy in Massachusetts for evidence of CTE; and serving on the CLF Family Advisory Board, which, according to the CLF's website, was created to allow family members of Legacy Donors "to have a voice in the operations of the Concussion Legacy Foundation and the Boston University CTE Center."

4.      As described in this Complaint, the actions of Ms. Archie have caused harm in Massachusetts to Ms. de Lench, a Massachusetts resident, and arise out of Ms. Archie's social media tweets which were published for viewing by Massachusetts residents.

5.      Venue is proper in this Court under 28 U.S.C. §1391(b)(3), as Ms. Archie is subject to personal jurisdiction in this judicial district.  Venue in the Eastern Division of this Court is proper pursuant to Local Rule 40.1(D)(1)(c).

<u>FACTS</u>

6.      Ms. de Lench is a longtime youth sports safety educator, author, blogger, documentary filmmaker, journalist, and activist.  She is producer/director of the 2013 PBS

documentary, *The Smartest Team: Making High School Football Safer*, author of the 2006 book, *Home Team Advantage: The Critical Role of Mothers in Youth Sports*, and Executive Director of MomsTEAM Institute, Inc. ("the Institute"), a 501(c)(3) non-profit, which, through its www.MomsTEAM.com website, has been providing youth sports stakeholders since August 2000 with information on a wide array of youth sports health, safety, nutrition, and sports parenting topics, including head injuries in sports.  In 2002, Ms. de Lench established Teams of Angels, a non-profit 501(c)(3) organization supporting families whose children have died or been catastrophically injured while playing sports.  Over the past eighteen years, she has helped numerous families who have lost children to injuries in sports.  Most recently, the Institute, with a "Mind Matters" grant from the National Collegiate Athletic Association and Department of Defense, launched a website, www.concussions.smart-teams.org, specifically devoted to the subject of head injuries in sports.

   7. Since approximately 2006, Ms. de Lench and MomsTEAM have reported extensively on research concerning chronic traumatic encephalopathy ("CTE"), a neurological disease which has been linked to repetitive head impacts, such as those sustained by athletes playing contact and collision sports, including tackle football.  In none of Ms. de Lench's blogs or articles, nor those of MomsTEAM, has she or MomsTEAM ever denied the existence of CTE or the link between football and CTE.

   8. Ms. de Lench maintains a social media presence on Twitter (@BrookeDeLench (3,432 followers), @SmartTeams (9,478 followers), @TheSmartestTeam (2,048 followers) and @MomsTEAM (16.2K followers)) and Facebook.

9.      According to her LinkedIn biography, Ms. Archie is, among other things, a legal consultant, founder of the National Cheer Safety Foundation, and one of the nation's leading experts in sports risk management.  Ms. Archie is co-founder of the group, Faces of CTE ([www.FacesofCTE.com](http://www.FacesofCTE.com)), which, according to its website, is a collaboration of sport families affected by CTE, dedicated to raising awareness and increasing brain donations to further science and research to prevent, treat, and cure CTE.  She is also behind a social media campaign called "Save Your Brain."

10.     Ms. Archie maintains an active presence on social media.  She posts on Twitter under her own name (@kimberlyarchie; 4,213 followers), using the Twitter handles @FacesofCTE; 227 followers) and @SaveYourBrain; 66 followers), and, on information and belief, under a number of anonymous accounts, including but not limited to, @tackleCTE; 21 followers).

11.     On September 1, 2014, Ms. Archie's son Paul died in a motorcycle accident. As alleged in the Third Amended Complaint in a class action lawsuit in which Ms. Archie is lead plaintiff captioned <u>Archie v. Pop Warner Little Scholars, et. al.</u> (Case. No. 2:16-cv-6603-PSG-PLA), currently pending in the United States District Court for the Central District of California, Paul was later found in an autopsy performed by Dr. Ann McKee ("Dr. McKee") at the VA-BU-CLF Brain Bank in Bedford, Massachusetts, to have been suffering from Stage 1 CTE.

12.     In an email to Ms. Archie dated September 4, 2014, Ms. de Lench expressed condolences on the loss of her son.  Ms. Archie responded in an email to Ms. de Lench dated September 16, 2014 in which she claimed, without any evidence, that Ms. de Lench was

hurting and exploiting her as a grieving mother.  Ms. Archie's email presaged a multi-year campaign on social media to defame Ms. de Lench, a course of conduct which continues to this day.

13.     The opening salvo in Ms. Archie's campaign of defamation came in a tweet on April 25, 2015 in which she accused Ms. de Lench, in tweeting a link to an article in the NCAA's *Champion Magazine* in which Dr. McKee admitted that there was a certain amount of "sensationalism" in publicizing the autopsies of athletes found to have had CTE (a tweet which made no reference to Ms. Archie's son, Paul), of "kicking a grieving mom in the stomach," stating that "history will reflect who took a stand for kids and who continued to deny CTE."

14.     In a tweet on or about November 10, 2015, Sony Pictures announced that it had selected MomsTEAM as its charity of choice in connection with a social media campaign dubbed "Dance or Donate" modeled on the ALS "Ice Bucket Challenge" in support of its forthcoming movie, *Concussion*, starring Will Smith as Dr. Bennet Omalu, the forensic neuropathologist whose discovery of CTE in the brains of former National Football League players had brought the disease into the national consciousness a decade earlier.

15.     Ms. Archie responded to Sony's announcement with a tweet asking, "MomsTEAM doesn't believe in CTE so how is this possible?" She later retweeted a post by one of her followers, @NFLObjectors, suggesting that Sony cancel its promotion with MomsTEAM – which she again characterized as a "CTE denier" – and falsely accused Ms. de Lench of "spitting on [her] dead son [sic] grave."

16.     In a tweet later that day, Ms. Archie asked her friends for help in taking on Ms. de Lench, whom she characterized as a "monster" who had been "torment[ing]" her since her son died.

17.     On November 11, 2015, Ms. de Lench emailed Ms. Archie a letter from her attorney demanding that she cease and desist defaming her and tortuously interfering with MomsTEAM's partnership with Sony.  Five minutes later, Ms. Archie responded dismissively in an email stating, "I can't take this serious [sic]."

18.     On November 11, 2015, approximately five hours after Ms. de Lench's attorney sent Ms. Archie a cease and desist letter, @ricesposito, responding to Sony's announcement of its partnership with MomsTEAM, asked in a tweet, "This is the new partnership for the @concussionmovie? Isn't the point of the movie to call out those who deny CTE?"

19.     In another tweet that day, Ms. Archie falsely accused Ms. de Lench and MomsTEAM of taking a "very public stance that CTE is not directly related to hits in football.…"

20.     On November 12, 2015, Ms. de Lench emailed Enrico Esposito ("Mr. Esposito"), the owner of the @ricesposito Twitter account, to request that he delete his tweet of the previous day, surmising – correctly, as it turned out – that it was "more than likely encouraged by Ms. Kimberly Archie who has been issued a cease and desist letter by our staff attorney for posting defamatory comments on Twitter about MomsTEAM Institute, Inc. and for serious business interference issues."

21.     Mr. Esposito responded in an email by stating that he had "not been on [Twitter] in quite some time" and had not Teeted [sic] anything." He asked what he had to do to correct the situation.

22.     Ms. de Lench responded in an email to Mr. Esposito in which she asked him to confirm that he was a friend of Ms. Archie, and, if so, to ask her who was tweeting using his Twitter account, as the tweets appeared to dovetail with Ms. Archie's smear campaign, and whether she had access to his Twitter password.

23.     Mr. Esposito responded in an email in which he stated that he had just talked to Ms. Archie, that she was deleting the post and closing his account, and apologized for the "confusion."

24.     Ms. de Lench responded in an email a short time later in which she stated that "'confusion' [was] the wrong word.  [Ms. Archie] is interfering with our business," and demanded that he tweet an apology.

25.     Mr. Esposito responded an email stating that his "tweeter account was utilized inappropriately and unauthorized without my knowledge.  The tweet post has been taken down and my account has been closed.  I apologize to MomsTeam for the inappropriate tweet."

26.     In a tweet on January 25, 2016, Ms. Archie falsely stated that Ms. de Lench had "told reporters I lied re my son's CTE."  Later that same day, Teddy Cutler ("Mr. Cutler"), a journalist who had written a December 28, 2015 article about the *Concussion* movie which included information obtained in an interview with Ms. Archie, wrote in an email to Ms. Archie, Ms. de Lench, and Irvin Muchnick ("Mr. Muchnick"), a blogger who had published in late December 2015 a number of defamatory articles concerning Ms. de Lench on his website,

www.concussioninc.net, to "correct an error of my making that has since been propagated on

social media and blogs and caused damage to the reputation of Brooke de Lench and

MomsTEAM" by "mak[ing] clear that Ms. de Lench sought only to correct my point [in the

article] that football alone might cause CTE and not to question [Ms. Archie]'s son's [CTE]

diagnosis." He went on to inform Ms. Archie that Ms. de Lench "never claimed to me that you

lied about your son's CTE." The email concluded with the following statement: "I accept

responsibility for this misunderstanding and would like to reiterate that Ms. de Lench never

questioned the CTE diagnosis of [Ms. Archie's] son."

27.     In a tweet on February 26, 2016, Ms. Archie for the first, but not last time,

falsely accused Ms. de Lench of using multiple accounts to harass her. She stated that "Twitter

[had] shut one of them down but she keeps at it."

28.     On March 20, 2016, Ms. Archie falsely accused Ms. de Lench of being a "CTE

denier," and of "mean and spiteful posts regarding my dead son," which, she said, "seem to be

serving you well." Ten days later, Ms. Archie posted the same message on MomsTEAM's

Facebook page.

29.     In an email to Ms. de Lench dated April 11, 2016, Ms. Archie falsely accused

Ms. de Lench of tweeting under anonymous, so-called "burner", Twitter accounts.

30.     On November 13, 2016, Ms. Archie claimed in an email to Ms. de Lench that

she was in possession of information that a Twitter account had been identified as controlled

by Ms. de Lench, and falsely accused her of engaging in an ongoing campaign of harassment

since her son's death. Ms. de Lench responded in an email to Ms. Archie that, when she

realized the Twitter accounts were not hers, she expected Ms. Archie to make a public apology to Sony, and everyone else she had "dragged through her dramas."

31.     On November 15, 2016, Mr. Muchnik claimed that Twitter had busted a fake account which was allegedly harassing mothers of dead football youth, and, in a blog post on his website, www.concussioninc.net, elaborated on that claim by stating that, earlier that week, Twitter had purged @carryon123456, which he asserted was one of the several "troll accounts" which Brooke de Lench of the MomsTEAM Institute was using to harasses critics of youth football – most particularly "advocates who are mothers of dead players."  Mr. Muchnik went on to state that the "social media company said it had investigated and suspended @carryon123456 'as it was found to be participating in abusive behavior.'" In addition, Mr. Muchnick repeated his claim that Ms. de Lench had smeared "a family that had lost a son to CTE" to a *Newsweek* reporter.  On information and belief, Mr. Muchnick obtained the information about Twitter's alleged suspension of @carryon123456 and alleged harassment of critics of youth football, particularly of mothers of dead players, from Ms. Archie.

32.     On November 16, 2016, Ms. de Lench informed Ms. Archie that she had "absolutely no idea" who owned the Twitter account Ms. Archie claimed she controlled.

33.     In a tweet on December 2, 2016, responding to a tweet by @OkayestOfMoms questioning whether CTE really was to blame for her son's death, Ms. Archie informed her Twitter followers that she had "blocked every 1 of Ms. de Lench's 'phony accounts'" and vowed that Ms. de Lench would not "get away with" mocking her son's death.

34.     In a series of tweets in or about December 2016, Ms. Archie falsely accused Ms. de Lench of engaging in a two-year campaign of online harassment, both from her real account

and from anonymous burner accounts; stating that it wasn't just one incident, it was "every day now, and has been ongoing for more than two years," and that the harassment came "mostly from phony accounts" in which Ms. de Lench had tagged her.

35.     In a tweet on December 19, 2016, Ms. Archie falsely asserted that Ms. de Lench had set up a phony account to "mock [her] son's death and defame [her] every day," and asked, "Isn't his death enough?"

36.     In a tweet on December 21, 2016, Ms. Archie, responding to a tweet by @OkayestOfMoms linking to an August 12, 2016 story in the *Los Angeles Times* in which her son Paul's father, Paul Bright, Sr., was quoted as saying that the notion that CTE caused his son's death was "irresponsible," stated, "The holiday torment by Brooke de Lench continues."

37.     In a twitter thread on December 22, 2016, Ms. Archie falsely accused Ms. de Lench of being @OkayestofMoms and of being a CTE denier, which she equated to being a "Sandy Hook truther", i.e. someone who believed the 2012 mass shooting at Sandy Hook Elementary School in Newtown, Connecticut was fake.

38.     Ms. Archie's false accusations regarding Ms. de Lench prompted a number of her followers to threaten physical violence against Ms. de Lench, with one saying in a tweet that she would "like to beat her ass" – prompting another follower to respond by saying she would "hold her down"; another saying that Ms. de Lench was a "bitch" who "needs to be slapped. Hard. Upside her neck (because we don't hit heads.) Knock her cruelty right out of her," prompting a response from another of Ms. Archie's followers that she was "actually quite ok w inflicting head injuries on her. Maybe putting her in the hospital will make her see the

error of her ways … At least it will shut her up." Ms. Archie stated that she was "exhausted from the constant hits by the zealots who keep mocking Paul's death."

39.     In another tweet, replying to @brendatracy24, Ms. Archie referenced a "woman who claims to be an advocate for children in sports herself … [who] spends endless time using and creating new accounts," and, when Ms. Archie blocked her or got an account suspended, "just makes another one."

40.     In a tweet on August 25, 2017, Ms. Archie gave a "[b]ig shout out to my trolls advertising how great I am!!! Keep up the great work!" Her tweet went on to say, "we all know who it is. Same person who has been obsessed with grieving moms & their dead kids [sic] stories for more than a decade."

41.     On August 2, 2017, Ms. Archie exchanged tweets with Cyndy Feasel ("Ms. Feasel"), another mother of an athlete diagnosed after death to have been suffering from CTE, referring to a "so called advocate team for 'moms' hiding behind anonymous twitter accounts" and including the hashtags #subpoena #coming soon." Ms. Archie went on to accuse Ms. de Lench of "[s]uper creepy stalker type stuff" and being "unstable," to which Ms. Feasel responded, "It's just unnecessary and a mental condition that needs treatment." Ms. Archie then tweeted, "It will all come out soon and then what? How will they save face then? Trolling grieving moms/families is lower than low. #crazytown."

42.     In a tweet on December 20, 2017, Ms. Archie falsely stated that Ms. de Lench was an "obsessed stalker" who "continues to mock Paul's death. Now she has almost a dozen Twitter accounts of which I have blocked her from all of them. Yet she posts this today from

one of her phony accounts. Twitter did shut down one account but with new ones constantly popping up, it's impossible to stop."

43.    In a second tweet that day, Ms. Archie falsely accused Ms. de Lench of stalking and trolling a grieving mom about her dead son and no one says or does anything, and that she had to take it day after day.

44.    In a tweet by @tackleCTE on February 16, 2018, Ms. Archie demanded that @CoachFore "stop stalking a grieving mom over her son's death. It's not helping your cause."

45.    In a tweet on April 6, 2018 (since deleted), @tackleCTE expressed surprise that @CoachFore, who she said seemed like a "fairly smart guy," had fallen into doing the bidding of a "crazy woman."

46.    In a tweet on April 18, 2018, Ms. Archie, tweeting as @FacesofCTE, replied to a tweet by Ms. de Lench by asking whether she planned to continue attacking CTE families.  In a twitter exchange between Ms. Archie, @NFLObjectors, and journalist @patrick_hruby, NFLObjectors, responding to tweets from @DanConner76, suggested that the tweets posted from that account were prepared by Ms. de Lench and wondered whether the handle belonged to her.

47.    In a tweet in or about June 2018, @tackleCTE, responding to a tweet by @kewlhandluke11 suggesting that the brains of Kate Spade and Anthony Bourdain be checked for CTE-like symptoms, asked, "Brooke when will you stop trolling as a fake person?"

48.    In a tweet on June 19, 2018 responding to a tweet by @kewlhandluke11, @tackleCTE again asked, "Brooke de Lench: when are you going to stop trolling CTE families from burner accounts? You realize that this is traceable, right?"

49.     In a tweet on June 20, 2018, @tackleCTE asked Ms. de Lench to "spare us the CTE denier trolling from a phony account."  Responding to a tweet by @kewlhandluke11, @tackleCTE tweeted, "Again Brooke de Lench of MomsTEAM aka Luke Johnson burner account you are only burying yourself with this CTE denier nonsense."

50.     In a tweet on June 26, 2018, @tackleCTE, responding to a tweet by Ms. de Lench reposting an article by an MomsTEAM editor entitled "CTE: Is the Media Scaring Young Athletes to Death?", asked, "Is this why you troll CTE families, mock them about their dead children?"

51.     On August 16, 2018, two of Ms. Archie's Twitter followers, Kent Johnson and NFLObjectors, asked in response to a tweet by @DanConner76 whether he was the new Twitter handle of a "goofy woman" who supposedly had a dozen or so such handles, to which Ms. Archie replied, falsely, that @DanConnor76 was Ms. de Lench, and that she was also Luke Johnson.

52.     In a tweet on September 15, 2018, Ms. Archie said it was "[h]ilarious for a Sybil to use who [sic] own article and tweet it out from a phony burner account. Brooke thinks she is sneaky, but we all know it's just her from another alias."  That same day, Ms. Archie, tweeting as @FacesofCTE, stated that Ms. de Lench was a troll posing as Peter Luke or whoever else she plays today that you interact with as if they are all different.

53.     On September 20, 2018, Ms. Archie, tweeting as @FacesofCTE, asked Ms. de Lench, if she wanted to be a "CTE denier," to use her real twitter account.

54.     In a tweet on October 21, 2018, Ms. Archie stated that "DanConnor76, and KewlLuke and Peter whatever are all Brooke de Lench so it's pointless to discuss this with someone who won't speak publicly but hides behind burner accounts."

## COUNT I

### (Libel)

55.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

56.     Ms. Archie's tweets and Facebook posts claiming that Ms. de Lench was behind burner accounts are assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to the identity of the individual who opened such accounts.

57.     Ms. Archie's tweets and Facebook posts affirmatively state and/or imply knowledge of objectively verifiable information and/or access to information about the ownership of the accounts not available to others which identify Ms. de Lench as the owner.

58.     Ms. Archie's tweets and Facebook posts claiming that the owners of the burner accounts were engaged in a systematic campaign of harassing families of children who had died from CTE in general, and had specifically harassed Ms. Archie as the mother of a CTE victim, are assertions of fact capable of being proven true or false, and did not constitute imaginative expression or rhetorical hyperbole.

59.     Ms. Archie's tweets and Facebook posts asserting that Ms. de Lench was a "CTE denier" are capable of being proven true or false, and did not constitute imaginative expression or rhetorical hyperbole.

60.     Ms. Archie's tweets and Facebook posts were false in at least the following three respects: first, none of the so-called "burner" accounts which Ms. Archie has repeatedly and categorically attributed to Ms. de Lench were, in fact, opened and maintained by Ms. de Lench; second, none of the tweets and Facebook posts from the accounts which Ms. Archie falsely claimed were Ms. de Lench's engaged in harassment of mothers of children in general who died from CTE or targeted Ms. Archie for specific harassment; and, third, the tweets in which Ms. Archie claimed that Ms. de Lench was a "CTE denier" were objectively false, as even a cursory review of Ms. de Lench's blogs and articles would have demonstrated.

61.     Ms. Archie's Tweets and Facebook posts were made with actual malice in that they were made either with Ms. Archie's actual knowledge of their falsity, a high degree of awareness of their probable falsity, or with reckless disregard of their truth or falsity, and were published in furtherance of a general scheme by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

62.     Ms. Archie's tweets and Facebook posts have caused damage to Ms. de Lench by holding her up to contempt, hatred, scorn, or ridicule, by damaging her reputation in the youth sports safety community in general, and in the sports-related head injury safety community specifically, by discrediting her in the minds of a considerable and respectable class in the community, and by causing her to suffer mental distress and anxiety.

<u>PRAYERS FOR RELIEF</u>

**WHEREFORE,** Plaintiff Brooke de Lench respectfully requests that this Court:

A.     Enter judgment for the plaintiff and award her damages as determined after a
         trail on the merits;
B.     Award plaintiff costs of suit; and
C.     Grant such other and further relief as this Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

Respectfully submitted,

BROOKE DE LENCH

By her attorney,

 /s/ Lindsey M. Straus /s/
Lindsey M. Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
110 Court Way
Brewster, MA 02631
(508) 896-8008
lindseystrausoncape@gmail.com

Dated: December 10, 2018