UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BROOKE DE LENCH<br>    Plaintiff,<br><br>v.<br><br>KIMBERLY ARCHIE,<br>    Defendant. | Civil Action No.: 1:18-cv-12549-LTS<br><br>DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS |

**INTRODUCTION**

This claim arises from professional and personal differences between advocates in the same professional field, youth safety in sports. While even on their face, none of the allegedly libelous statements is truly defamatory, the context of the statements makes it abundantly clear that they have been made as part of a vigorous dispute between two advocates in the sports safety field where a contentious debate about Chronic Traumatic Encephalopathy ("CTE") and football is under way. That debate, which began years ago, has led to efforts including the recent introduction of a bill before the Massachusetts legislature which would prohibit tackle football for children in grades below seventh.[1] The complained-of statements related to, and have their genesis in, this dispute.[2]

Plaintiff instigated a conflict with Ms. Archie over the issue of CTE, and escalated it by personally insulting Ms. Archie, by bringing the case of Ms. Archie's deceased son into the parties' professional dispute over CTE posed by youth playing tackle football, and by repeatedly

---

[1] Attached as Exhibit 1 is a copy of a March 1, 2019, New York Times article regarding the referenced bill, as well as a New York Times Magazine article from 2014 about CTE and the National Football League.
[2] Plaintiff has authored a number of articles on CTE, including that attached at Exhibit 2, with her counsel as co-author.

publicly questioning Ms. Archie's account of her son's health, the reasons for his death, and Ms. Archie's own integrity in campaigning against CTE based in part on her son's death and CTE diagnosis. The conflict over CTE and public policy has included certain outrageous steps by Plaintiff, including implying that Ms. Archie's son might have suffered CTE due to child abuse. What it has not included, however, is any actionable defamation by Ms. Archie, because all of her statements have been expressions of opinion, or figurative speech, and anything approaching a factual assertion, in addition to being true or otherwise non-defamatory as a matter of law, has been protected by the Massachusetts anti-SLAPP statute, or otherwise privileged by the right of self-defense or other privileges.[3] In addition, Plaintiff's own actions have made her a limited purpose public figure, and she has not adequately alleged "actual malice," as such a figure must to support a defamation claim. For all of these reasons, her libel claim must be dismissed.

## ARGUMENT

### I. UNDER THE APPLICABLE MASSACHUSETTS SUBSTANTIVE LAW AND FEDERAL PROCEDURAL RULES, THIS CASE SHOULD BE DISMISSED AT THIS EARLY STAGE.

Choice of law principles indicate the application of Massachusetts law to this diversity action. As all of the complained of statements were made on the Internet, they constitute multi-state publications. Section 150 of the Restatement (Second) of Conflict of Laws addresses the issue of what law to apply where, as here, publication took place in several states. Under section 150, unless another state has a more significant relationship under the principles set forth in section six, the law of the state where the defamed person was domiciled at the time of publication applies 'if the matter complained of was published in that state.'" *Restatement*

---

[3] Ms. Archie has set forth the allegedly defamatory material as presented in the complaint, along with the actual text of the referenced statements, and a summary of reasons why each is not defamatory, in a chart attached hereto as Exhibit 3.

*(Second) of Conflict of Laws* § 150(2) & comment b (1971); *Davidson v. Cao,* 211 F. Supp. 2d 264, 274 (D. Mass. 2002). The social media posts and tweets, which comprise the bulk of the complained of material, were visible from any state, and Plaintiff alleges she was domiciled in Massachusetts for the relevant period. As a result, Massachusetts law should apply.

Under the substantive law of Massachusetts and the procedural rules of the federal courts, this action should be dismissed now, on the papers, because defamation actions lend themselves to resolution on a motion to dismiss given that "[t]he most critical part of the record – the speech itself – is available prior to any discovery." *Hatfill v. N.Y. Times Co.*, 427 F.3d 253, 255 (4th Cir. 2005) (Wilkinson, J., dissenting from denial of rehearing). "Whether the statements are defamatory as a matter of law will therefore be ripe for decision." *Id*. Courts should not allow the early procedural posture of a defamation case to "obscure its constitutional importance" given that such lawsuits "raise the specter of chilling future speech." *Id.* at 254-55. To carry out the constitutionally significant role entrusted to it, the Court should therefore carefully review the actual words of the alleged defamatory statements to determine, as a matter of law, whether they are capable of bearing a defamatory meaning and they are legally privileged, or both.

II. **MANY IF NOT ALL OF THE COMPLAINED OF STATEMENTS HAVE BEEN TAKEN OUT OF CONTEXT, SELECTIVELY QUOTED TO ELIMINATE PERTINENT CONTEXT, ARE OUTSIDE THE STATUTE OF LIMITATIONS, OR DO NOT IDENTIFY PLAINTIFF AND THEREFORE CANNOT FORM A BASIS FOR DEFAMATION.**

Plaintiff's pleading of her defamation claim without reciting more than disjointed phrases is per se inadequate.[4] By selectively (and minimally) quoting the Communications, or by

---

[4] Plaintiff complains of approximately thirty messages on social media, several email messages, and one presumed communication by an unknown method (collectively, "the Communications"). Some of the Communications recited in the Complaint fall outside the statute of limitations for defamation. *See* Complaint, ¶¶ 13-25; G.L. c. 260, § 4; *McLaughlin v. Boston Retirement Board*, 146 F.Supp.3d 283, 290 (D. Mass. 2015)("The statute of limitations for a defamation claim is three years, Mass. Gen Laws. Ch. 260, § 4, and the 'general rule is that the accrual period begins upon publication of the defamatory

3

misquoting them, Plaintiff strips them of important context, and in some instance, changes their meaning. For example, in Paragraph 41 of the Complaint, Plaintiff alleges she was accused of "super creepy stalker type stuff" and being "unstable." What the referenced tweet actually says in its entirety is "Super creepy stalker type stuff is scary actually. Unstable to do such things and use so much time." Exh. 3J. There is no reference to Plaintiff in the tweet (or any of the tweets that precede it in the thread), but her selective quotation implies that there was. In addition, Plaintiff has appended to the language quoted above a separate exchange in which Defendant again did not refer to Plaintiff by name, but referenced a "so called advocate team for 'moms' hiding behind anonymous twitter accounts." *Id*. By laying out these separate tweets as if they were linked, Plaintiff creates an erroneous impression. Ms. Archie's Twitter feed comprises more than 91,000 tweets, often multiple Tweets per day, published over the course of many years. Affidavit of Kimberly Archie ("Archie Aff.") ¶ 4. By cherry-picking Tweets and stringing them together, Ms. DeLench creates the impression she was identified in Communications in which she clearly was not.[5]

After eliminating the Communications which cannot form a basis for defamation because they are outside the statute of limitations, were not published to any third party or contain no

---

statement'"). Other allegedly defamatory Communications suffer from other infirmities as a claimed basis for defamation, such as not being "published," because they were communicated only to Plaintiff. E.g., Complaint, ¶¶ 29-30.

[5] Similarly, in Paragraph 48, Plaintiff alleges she was defamed because Defendant wrote: "Brooke de Lench: when are you going to stop trolling CTE families from burner accounts?" However, what Defendant actually wrote is: "Brooke de Lench: when are you going to stop trolling CTE from burner accounts?" Exh. 3P. The erroneous inclusion of the word "families" is significant. Although Defendant disputes that accusing someone of "trolling" is a defamatory allegation, there is sense to the phrase "trolling CTE families," but none to the phrase to "trolling CTE" as it is not clear it would mean to "troll" a medical condition. The sentence as misquoted by Plaintiff may imply negative actions toward people. The truthfully rendered sentence does not. *See Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) (Where an allegation in the complaint is contradicted by the text of the document on which it relies, it is the actual text that controls).

clear reference to Plaintiff, twenty-two remain. Of those, Plaintiff has quoted a full sentence of the communications just ten times, and on at least two of those occasions, she has misquoted the Communication in question. For example, Plaintiff alleges in Paragraph 51 of the Complaint that she was accused in an August 16, 2018, tweet of being behind the @DanConner76 and @LukeJohnson Twitter accounts. The referenced tweet actually says: "Luke Johnson and Peter are the same troll hiding behind burner accounts." Exh. 3S. There is no reference to Plaintiff. Similarly, in Paragraph 39, Plaintiff claims to have been defamed by a discussion of her allegedly making new accounts and, when blocked, making new ones. In addition to being facially non-defamatory, the tweet makes no identifying reference to Plaintiff.[6] Exh. 3H. However, by pleading the Communications as she has and without setting forth the full Communications, Plaintiff has changed their meaning.

### III. THE ACTUAL WORDS OF THE COMMUNICATIONS ARE PROTECTED OPINION, HYPERBOLE AND FIGURATIVE LANGUAGE.

Although it is sufficient ground for dismissal that the Plaintiff has changed the Communications' meaning by pleading them as she has, the Court is entitled to, and in fact, should look to the Communications in their entirety to determine whether to dismiss the claim. Where a defamation claim relies on a particular published statement, that statement is "incorporated" into the pleadings, and can be considered in its entirety as part of the adjudication of a motion to dismiss. *See Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir. 1988) ("[W[hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading"). *See also Stanton v. Metro*

---

[6] The Communication says, in response to a third-party's complaints of being annoyed online: "This is so true. I have a woman who claims to be an advocate for children in sport herself. She spends endless time using and creating new accounts. I block her or get an account suspended and she just makes another one. Once they get obsessed with you, ignoring them doesn't work." Exh. 3H.

5

*Corp.*, 438 F.3d 119, 123 (1st Cir. 2006) (applying Massachusetts law and considering the allegedly defamatory article, as submitted by defendant); *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)(documents acknowledged as authentic and relied upon by complaint merge into the pleadings and may be considered on motion to dismiss). That rule has particular applicability where the claim is for defamation, as in *Fudge* and this case, because the most fundamental element of the claim is the words uttered by the defendant. Moreover, where an allegation in the complaint is contradicted by the text of the document on which it relies, it is the actual text that controls. *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014).

Defamation is the communication of a statement concerning the plaintiff which is false and causes damage to the plaintiff. *McAvoy v. Shufrin,* 401 Mass. 593, 597 (1988). Only statements of fact, however, are capable of being false. Statements of opinion—utterances that do not convey an assertion of fact—are constitutionally protected, and therefore are not actionable as defamation. *Fudge*, 840 F.2d at 1016 ("If the challenged statement is one of opinion rather than fact, then under the First Amendment it generally cannot give rise to a defamation claim"). "The Supreme Court of the United States has determined that … only statements that are 'provable as false' are actionable; hyperbole and expressions of opinion unprovable as false are constitutionally protected." *Veilleux v. NBC*, 206 F.3d 92, 108 (1st Cir. 2000). In the defamation context, an expression of "pure opinion" is not actionable. *King v. Globe Newspaper Co.*, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281, and 485 U.S. 962 (1988). *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340 (1974) ("Under the First Amendment there is no such thing as a false idea. However

pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas").

The determination whether a statement is protected opinion is a matter of law for the court. *Fudge*, 840 F.2d at 1016; *Lyons*, 415 Mass. at 263 (whether a statement constitutes fact or opinion is a "question of law for the court to decide"). Courts generally engage in the following multi-step process to determine whether a statement is a constitutionally protected opinion:

> [F]irst . . . analyze the common usage or meaning of the allegedly defamatory words themselves . . . Secondly, consider the degree to which the statements are verifiable -- is the statement objectively capable of proof or disproof? . . . Thirdly, examine the context in which the statement occurs. . . . Examine, finally, the broader social context into which the statement fits.

*Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 137 (D. Mass. 1996) (citing *Ollman v. Evans*, 750 F.2d 970, 979-83 (D.C. Cir. 1984)). Courts applying Massachusetts law have found that the "pure opinion" doctrine is applicable in this particular type of factual scenario: the characterization of another's conduct. *See Cole v. Westinghouse Broadcasting Co., Inc.,* 386 Mass. 303, 312 (1982)(concluding that, viewed in context, statement that a reporter was "sloppy and irresponsible" was opinion and could not reasonably be viewed as a factual assertion); *Petsch-Schmid v. Boston Edison Co.,* 914 F.Supp. 697, 705 (D. Mass. 1996) (concluding that statements that employee was unprofessional, had a performance problem, and could not complete her work on time were protected opinions). Furthermore, when a statement is "imprecise, inherently subjective, and not readily capable of being proven true or false," it is a statement of opinion that cannot form the basis of a defamation action. *Cluff v. O'Halloran*, No. 99-0428A, 2000 WL 33115601, at * 6 (Mass. Super. Ct. Dec. 22, 2000)(calling someone "incompetent" would not support a defamation claim).

Some language, while insulting, is per se too vague and unproveable to support a defamation claim. S*ee Levinsky's v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 128, 130-131 (1st Cir. 1997)("quintessentially subjective" language, such as "rhetorical hyperbole," "imaginative expression," and "loose, figurative" statements, cannot be the basis of a defamation claim ). This doctrine leads to the conclusion, affirmed by the First Circuit, that mere insults will not support a defamation claim. "[S]tatements that are too vague to constitute defamation generally fall into the category of epithets, such as 'communist,' *Nat'l Ass'n of Gov't Employees,* 379 Mass. at 228–29, 396 N.E.2d at 1001–02, or 'absolute barbarian, lunkhead, meathead, and nut,'" 438 F.3d at 131. *See also Myers v. Boston Magazine Co., Inc.,* 380 Mass. 336, 343 (1980) (collecting cases "involving protected hyperbole or rhetorical excess, which included "a traitor to his God, his country, his family and his class," "blackmail," and "fascist," and holding, "[i]n loose usage, epithets such as 'blackmailer,' 'traitor,' or 'fascist' tend to create murky atmosphere of opprobrium and unexamined opinion….[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies … is not to falsify facts.")(quotations omitted). In light of the case law, Plaintiff's complaints that Defendant labelled her a "Sybil" is not actionable. Complaint, ¶ 52. Nor is her allegation that Defendant, allegedly referring to Plaintiff, asked a third party why he would do the bidding of a "crazy woman." *Id.* ¶ 45.

The Communications are rife with hyperbole, figurative and imprecise language. Plaintiff complains she was accused of "trolling as a fake person," and "trolling from a phony account" and "troll[ing] CTE families." *Id*. ¶¶ 47, 49, 50. She also claims she was accused of posting "mean and spiteful posts regarding [Defendant's] dead son." *Id*. ¶ 28. These are clearly non-defamatory, or matters of opinion that are otherwise unproveable. Trolling evades precise

definition. *Compare Fairbanks v. Roller*, 314 F.Supp.3d 85, 93 (D.D.C. 2018)(defining trolling as provoking); *South Middlesex Opportunity Council, Inc. v. Town of Framingham*, No. 07–12018–DPW, 2008 WL 4595369, at *22 (D. Mass. Sept. 30, 2008) (using "trolling" to mean "searching for" and identifying as potentially defamatory parts of the relevant sentence <u>other</u> than the word "trolling"). [7] "Mean" and "spiteful" are clearly matters of opinion. Furthermore, the admonition from the *Gillette* court that context, including social context, matters is critical here. The Restatement recognizes the same principle, noting, "Words uttered face to face during an altercation may well be understood merely as abuse or insult, while words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously." *Restatement (Second) of Torts* § 566 cmt. e (1977). The immediate and social context for these statements is, as discussed in greater detail below, an acrimonious relationship between two advocates in a specialized area, which in turn is home to a heated debate about the appropriate policy responses to the problem of CTE. The medium for the statements is almost exclusively Twitter, where comments are made and published instantaneously and where the norms are consistent with the complained-of Communications. Given the speed and informality of Twitter, it is arguably the modern equivalent of "[w]ords uttered face to face during an altercation…."

The numerous Communications paraphrased and partially quoted in Plaintiff's Complaint make it difficult to determine precisely which are the Communications she claims are factual allegations which defame her. However, she alleges that: (1) "Ms. Archie's tweets and Facebook posts claiming that Ms. de Lench was behind burner accounts are assertions of fact capable of being proven true or false," Complaint, ¶ 56; (2) "Ms. Archie's tweets and Facebook

---

[7] Neither of the posited definitions is facially defamatory.

posts claiming that the owners of the burner accounts were engaged in a systematic campaign of harassing families of children who had died from CTE in general, and had specifically harassed Ms. Archie as the mother of a CTE victim, are assertions of fact capable of being proven true or false," *Id*. ¶ 58; and (3) "Ms. Archie's tweets and Facebook posts asserting that Ms. de Lench was a 'CTE denier' are capable of being proven true or false." *Id*. ¶ 59. These appear to be the three categories of Communications that Plaintiff claims are defamatory factual assertions. As to the first, there is nothing disparaging to Plaintiff's reputation about the claim that she had "burner" or anonymous accounts on Twitter.[8] As to the second, what is "harassing" conduct is subjective and, as will be discussed below, in the context of the public debate about CTE and policy responses to it, taking controversial public positions and antagonizing one's opponents may be remarkably similar. Additionally, in the context of Plaintiff's course of conduct, discussed further below, her statements and actions may be fairly characterized as "harassing."[9] As to the third claim, whether one is a "CTE denier" – and whether being such a thing is equivalent to being a "Sandy Hook truther" – is not capable of proof or disproof. This entire dispute arises in the context of a robust public debate about CTE, its causation and incidence,

---

[8] To the extent that Plaintiff might allege that it means something more, such as that she is the type of person who hides behind false identities, or a dishonest person, it is worth noting again that the words of the Communications are what matter, not what meaning a party might attempt to assign to them. *Flotech, Inc. v. E. I. Du Pont de Nemours Co.*, 627 F. Supp. 358, 369 n. 4 (D. Mass. 1985) ("If the words of the offending item are incapable of a defamatory meaning, innuendo will not make them so…The innuendo cannot be used to enlarge the natural meaning of the words actually used") (internal citations omitted).
[9] Ms. Archie's statements are also insulated because to the extent that her opinions imply knowledge of facts, her facts are disclosed. For example, in Paragraph 50, Plaintiff complains that Ms. Archie accused her of harassing the families of those affected by CTE. Ms. Archie did make such a statement; she also linked it to a tweet by Ms. Archie which could have been regarded as highly offensive to those affected by CTE. *See* Exh. 10. Therefore, the basis for Ms. Archie's opinion was fully disclosed. This is akin to the example provided in *Lyon v. Globe Newspaper Co.*: "[I]f I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic." 415 Mass. 258, 262 (1993), quoting *National Ass'n of Gov't Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 227 (1979), cert. denied 446 U.S. 935 (1980).

10

and the risks posed by tackle football, particularly as played by children. In that context, to be a "denier" easily may refer to taking one stance on the complicated issues versus another. Despite Plaintiff's bare assertion that the claim she was a "CTE denier" was "objectively false," Complaint, ¶ 60, there is nothing simple or objective about the positions in the debate over CTE and football, and it is not possible to say that labeling Plaintiff a denier is "objectively" untrue.[10]

### IV. EVEN IF ANY OF THE COMMUNICATIONS COULD BE CONSIDERED DEFAMATORY, WHICH THEY CANNOT, THEY WOULD BE PROTECTED BY THE MASSACHUSETTS ANTI-SLAPP STATUTE AND COMMON LAW PRIVILEGE.

Even if it were possible to identify defamatory assertions of fact in the Communications, they would be protected because the Massachusetts anti-SLAPP statute protects Ms. Archie's speech. The so-called anti-SLAPP, or anti-"strategic lawsuits against public participation," statute, G.L. c. 231, § 59H, was designed to protect defendants against whom claims are asserted because of their exercise of their right of petition, and in order to chill said exercise. *See Cardno ChemRisk, LLC v. Foytlin*, 476 Mass. 479, 483 (2017). A SLAPP suit is a suit the object of which "is not necessarily to prevail, but rather, through the difficulty and expense of litigation, to discourage and intimidate individuals from exercising their constitutional right of petition." *Id*. Plaintiff's suit falls squarely into this category. The dispute underlying this matter has been simmering between the parties since at least 2014. The parties have staked out disparate positions in the public policy debate over youth football, and in particular, whether children under 14 should be banned from playing tackle football due to the risk of CTE. Defendant and her allies believe that due to the risks, there should be no tackle football for youth. Archie Aff., ¶ 5. Plaintiff's published positions state that the research is not sufficiently definitive on the

---

[10] It is noteworthy that Plaintiff has made a number of statements doubting the generally accepted theory of causation of CTE, or how common CTE is in those who have played contact sports. *See* Exhibits 4 and 5.

11

CTE/tackle football link for it to be eliminated for youth, and that further research should be conducted, and measures adopted to make tackle football safer. *Id*. ¶ 6, Exhs. 4-5, 9. Adding layers to this debate is the fact that Ms. Archie has a very personal stake in the issues because after her son's death in 2014 in a motorcycle accident, it was determined after his death that he had stage 1 CTE. Archie Aff. ¶ 7. It is Ms. Archie's understanding that her son's years playing football as a youth caused his CTE, and her belief that the CTE was a substantial factor in causing his accidental death by changing his behavior, including his impulse control and risk assessment. *Id*. ¶ 8. As set forth in detail below, Plaintiff has attacked this position taken by Ms. Archie as part of the overall debate about CTE and football, questioning the causes of Ms. Archie's son, Paul's, CTE, and apparently even the diagnosis itself. Plaintiff is now attempting to leverage the court system to silence Defendant, a prominent voice in the debate over CTE and football, to advance her own status as a safety advocate, and, by her own admission in published statements, "to sav[e] football." *Id*. ¶ 9, Exh. 5. This is part of a pattern Plaintiff has engaged in of trying to silence her opponents using the legal system, including her liberal distribution of cease-and-desist letters to those who disagree with her. *Id*. ¶ 18, Exh. 14.

The treatment of the anti-SLAPP statute in the federal courts in this Circuit has evolved over time. The emerging consensus appears to be that while historically the statute was regarded as procedural, and therefore inapplicable, it is in fact substantive, and therefore a special motion to dismiss pursuant to the anti-SLAPP statute is available in Massachusetts. *Steinmetz v. Coyle & Caron, Inc.*, No. 15-cv-13594-DJC, 2016 WL 4074135 at *3 (D. Mass. July 29, 2016)("Accordingly, the Massachusetts anti-SLAPP statute applies in federal courts"); *Shire City Herbals, Inc. v. Blue*, No. 15-30069-MGM, 2016 WL 2757366, at *4 (D. Mass. May 12, 2016)(applying anti-SLAPP statute and burden-shifting procedural framework); *Sullivan v.*

*Flaherty*, No. 14–cv–14299–ADB, 2015 WL 1431151, at *5, n. 5 (D. Mass. March 27, 2015)[11]; *Bargantine v. Mechanics Co-op. Bank*, No. 13–11132–NMG, 2013 WL 6211845, at * 3 (D. Mass. Nov. 26, 2013) ("[T]he Court will extend *Godin* [*v. Schencks,* 629 F.3d 79, 92 (1st Cir.2010)]'s holding and find the Massachusetts anti-SLAPP statute applicable as substantive law to diversity cases brought in federal court"). Furthermore, even where the Courts in the First Circuit, and District of Massachusetts in particular, have declined to apply the procedures set forth in G.L. c. 231, § 59H, they have agreed to employ the substantive positions of the statute – the principle that plaintiffs should not be allowed to use litigation to chill petitioning activity. *Baker v. Coxe*, 940 F. Supp. 409, 417 (D. Mass. 1996). Under either approach, the Court should examine the public policy debate in which the allegedly defamatory statements arise, and find that the anti-SLAPP statute protects Ms. Archie's speech, which is aimed at advocacy for her position, and defense of herself and her views from attacks by Plaintiff. *North Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 861–62 (2009)("Consistent with the expressed legislative intent, 'petitioning' has been consistently defined to encompass a "very broad" range of activities in the context of the anti-SLAPP statute….Petitioning includes all 'statements made to influence, inform, or at the very least, reach governmental bodies—either directly or indirectly.' ...In order to determine if statements are petitioning, we consider them in the over-all context in which they were made").

---

[11] In *Sullivan*, Judge Burroughs said, "[T]he First Circuit held that Maine's anti-SLAPP statute is substantive and applies to state law claims in federal court. 629 F.3d 79, 92 (1st Cir. 2010). Thereafter, in the unpublished opinion of *Bargantine v. Mechanics Coop. Bank,* Judge Gorton held, based on the logic of *Godin* and the similarity of language between the Maine and Massachusetts anti-SLAPP statutes, that the Massachusetts anti-SLAPP statute is also substantive and that its remedies thus may be imposed in a federal court proceeding….I am inclined to agree with Judge Gorton's view of the law…." *Sullivan*, at *5, n. 5.

Plaintiff has repeatedly interjected the death of Ms. Archie's son into the public debate over CTE and football by questioning whether Paul actually had CTE or whether CTE can properly be blamed for his death. Notably, while Plaintiff complains Ms. Archie defamed her by claiming Plaintiff "told reporters I lied re my son's CTE," she fails to acknowledge that a reporter had contacted Ms. Archie and represented to Ms. Archie that Plaintiff contacted him, unsolicited, specifically to challenge Ms. Archie's son's diagnosis of CTE. Exh. 7. (The reporter did not issue a statement claiming that he misunderstood Ms. de Lench until <u>after</u> the complained-of tweet. *See* Complaint, ¶ 26). Further, despite the fact that Plaintiff clearly knew that her commentary regarding Ms. Archie's son's death and his CTE diagnosis had been poorly received, she continued to interject Ms. Archie's son into the public debate on CTE and herself into discussions of Ms. Archie's son's death. Attached as Exhibit 8 is a comment posted by Plaintiff to a Los Angeles Times news story about Ms. Archie's son's death and CTE diagnosis. In the article, it is reported that Ms. Archie had spoken about her belief that CTE caused her son, Paul, to act impulsively, leading to his death in a motorcycle accident. The article further described Paul's father's dissenting view. Plaintiff commented: "I applaud [reporter] for asking the tough questions RE football = CTE, especially for this case….I will not get behind some people who are making the leap that football = CTE. We need to find out why some players will get CTE and others never will. We also need to follow the money on all the lawsuits that are springing up."[12] Exh. 8. Plaintiff further implied that CTE, and Paul's CTE, could have other causes: "MDs need to ask about all drugs, meds, other sports like rodeo, shaken baby, etc." *Id*. First, Ms. Archie was understandably offended at the implication that she was wrong about the cause of her son's CTE, and further offended at the suggestion it might have been caused by

---

[12] Plaintiff's published comments about Ms. Archie will support counterclaims that Ms. Archie will file if this matter is not dismissed.

14

child abuse.  Second, and just as critically, Plaintiff had inserted herself where there was no call for Plaintiff's commentary.  It is this type of conduct that has led Ms. Archie to characterize Plaintiff as a CTE denier, a term referring to her stance on CTE and football which Ms. Archie considers to be that of an apologist.  Ms. Archie has made this clear in tweets, including one complained of in Paragraph 49 of the Complaint.  In full, Ms. Archie said:

> "If you abuse substances without hits, NO CTE, if you have genetics without hits, NO CTE, the brain damage patterns from football are in specific spots based on mechanism of injury of hits in football so Brooke spare us the CTE denier trolling from a phony account.  Again Brooke de Lench of MomsTeam aka Luke Johnson burner account you are only burying yourself with this CTE denier nonsense.  You may want to learn that CTE is advanced brain damage at any stage & years of brain damage exist before it that the science is well established for."

Exh. 3Q.  The context for Ms. Archie's statements makes clear that Plaintiff's conduct has been highly provocative on a sensitive topic, Ms. Archie's son's death, and on a topic of substantial public controversy, CTE.  It is absolutely reasonable that Ms. Archie would have responded strongly, to defend both her views on CTE and associated public policy and her own – and her son's – reputation.

As she did in the comment posted to the Los Angeles Times article about Ms. Archie's son, Plaintiff has also repeatedly attacked the public position taken by Ms. Archie that no one under 14 should play tackle football, and in so doing, has accused those taking the no tackling under 14 position of relying on bad science, being reactive, being biased and jumping to conclusions. Exh. 9.  It is also to those actions that Ms. Archie has responded in labeling Plaintiff a "CTE denier" and a harasser of grieving families.  For example, in Paragraph 50, Plaintiff complains that Ms. Archie tweeted "Is this why you troll CTE families, mock them about their dead children?"  She fails to acknowledge that Ms. Archie was responding to a tweet in which Plaintiff said, allegedly in support of an organization for athlete mental health, "We will continue

15

to see athletes who have CTE but we need to educate them that there is help and they have a full life ahead before they prematurely end their own lives." Exh. 10. In context, a statement that CTE in athletes will continue to occur, and that athletes who suffer from it need education so they can make peace with their traumatic brain injuries rather than commit suicide is an inflammatory statement. Considered in the appropriate context, it is apparent that Ms. Archie's defense of her position is petitioning, within the meaning of the Massachusetts anti-SLAPP statute, and the libel claim must be dismissed unless Plaintiff can demonstrate that Ms. Archie's petitioning activities "lack a reasonable basis in fact or law, i.e. constitute sham petitioning, and that the petitioning activities at issue caused [her] injury" or that "each [challenged] claim was not primarily brought to chill the special movant's legitimate petitioning activities." *Blanchard v. Steward Carney Hosp. Inc.*, 477 Mass. 141, 159-160 (2017). The burden shifts to Plaintiff to make this showing.

In addition to the anti-SLAPP statute, the Communications are protected by the common law privilege of self-defense. "A libel may be privileged on the ground of self-defense," because when an individual is attacked, he "has a right to defend himself." *Conroy v. Fall River Herald News Pub. Co.*, 306 Mass. 488, 489 (1940). The privilege of self-defense includes the right to "brand the accusations as false and calumnious" and to "comment upon the motives of the accuser[.]" *Id*. at 489-90. Plaintiff has accused Ms. Archie of lying about a critically important topic: the health of her own, now deceased son, and the cause of his CTE, going so far as to suggest he might have suffered child abuse. Exh. 8. Plaintiff has also impugned Ms. Archie as "brain damaged" herself in correspondence to third parties, and has called Ms. Archie "very sick," accused her of "escalate[ing] a few paralegal courses into posing as a 'legal expert'" and said she has "us[ed her] poor dead son to promote [her]self." Exhs. 11-12. Plaintiff denied

16

ownership of a Twitter account which Ms. Archie complained was harassing her, but stated Plaintiff would "go in and like everything they said and become one of their friends," implying her support for the harassing account. Exh. 12. In this context, Ms. Archie's defense of her own truthfulness is entirely privileged, and she was permitted to comment on Plaintiff's motives, as she has in suggesting Ms. de Lench is motivated to downplay the risks of youth football and attack the science on CTE because, as Plaintiff has admitted, she is "pro-football" and wants to "sav[e] football." Exhs. 5-6.

IV. **PLAINTIFF IS A LIMITED PURPOSE PUBLIC FIGURE AND HAS NO FACTUAL BASIS TO ALLEGE 'ACTUAL MALICE' AS REQUIRED DUE TO THAT STATUS.**

Not only does Plaintiff's ongoing provocation of Ms. Archie provide critical context for examining the defamation claim, it also changes the very standard that applies to her claim. By "'voluntarily inject[ing] [her]self into a particular public controversy … [Plaintiff has] thereby become[] a public figure for a limited range of issues' – the so-called limited public purpose figure." *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 13 (1st Cir. 2011), quoting *Gertz*, 418 U.S. at 351. Plaintiff has persistently inserted herself into the debate over CTE and youth football, as discussed above. She has even voluntarily inserted herself into the question of whether families who connect their loved ones' CTE and/or deaths to football are being accurate, and whether they are relying on credible science. Exhs. 4-5, 9. As a result, she has made herself a limited purpose public figure, and must bear the "heavy, and often insurmountable, burden of proving actual malice" in order to prevail on a defamation claim. *Lluberes*, 663 F.3d at 14. Plaintiff's pleading fails to carry that burden.

A showing of actual malice requires "proof that the speaker published the statement with knowledge of its falsity or with reckless disregard as to whether it was false." *Pendleton v. City*

17

*of Haverhill*, 156 F.3d 57, 65 (1st Cir. 1998). Plaintiff has set forth a bare allegation that Ms. Archie acted with actual malice. Complaint, ¶ 61. She has not, however, set forth facts to support that assertion. As discussed above, Plaintiff has not addressed the fact pleaded in the Complaint that the email denying Plaintiff had questioned Paul's CTE diagnosis came <u>after</u> Ms. Archie's tweet stating that Plaintiff had done so.[13] Complaint, ¶ 26. As to the claim that Ms. Archie knew or acted in reckless disregard of the fact that Plaintiff was not behind the anonymous Twitter accounts, Plaintiff has failed to plead facts that would establish this. Plaintiff has pleaded only that she told Ms. Archie she had nothing to do with certain accounts. Given the history between the parties, and Plaintiff's clearly established pattern of attacking Ms. Archie's motives, family history, and account of Paul's death and diagnosis, there is little reason Ms. Archie would have accepted Plaintiff's assertion at face value. As for the claim that Ms. Archie knew or should have know that Plaintiff was not harassing families of CTE victims, the anonymous Twitter accounts could be said to have harassed such families, and it has not been established that those accounts are not Plaintiff's. (Also, the allegation is non-defamatory opinion, and a fair characterization of how Plaintiff has treated Ms. Archie). As a result, there is no established "truth" about the harassment of which Ms. Archie could have acted in disregard. Plaintiff has not adequately pleaded actual malice, and for this additional reason, her claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, namely (1) Plaintiff's inadequate pleading and misstating of allegedly defamatory statements, (2) the pure opinion or hyperbolic speech doctrine, (3) the

---

[13] Not only did Ms. Archie not receive the reporter's denial until after her Tweet, she had specifically been informed by a Newsweek reporter that Plaintiff had taken it upon herself to seek out and contact that reporter to challenge Paul's CTE diagnosis. *See* Exh. 7.

18

Massachusetts anti-SLAPP statute; (4) the common law self-defense privilege; and (5) the inadequate allegation of "actual malice," Ms. Archie respectfully requests that Plaintiff's complaint be dismissed.

The Defendant,
KIMBERLY ARCHIE,
By Her Attorneys:

BULKLEY, RICHARDSON & GELINAS, LLP

By:   */s/ Francis D. Dibble*
Francis D. Dibble, BBO No. 123220
Elizabeth S. Zuckerman, BBO No. 673190
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel. (413) 272-6232
Fax (413) 272-6806
fdibble@bulkley.com
ezuckerman@bulkley.com

CERTIFICATE OF SERVICE AND
COMPLIANCE WITH LOCAL RULE 7.1(2)

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), this 4th day of March, 2019. I further certify I conferred with Plaintiff's counsel Lindsey Straus by telephone on March 1, 2019, and we attempted in good faith to resolve or narrow the issues between the parties, but were unsuccessful at resolving the issues presented in this motion.

*/s/ Francis D. Dibble*
Francis D. Dibble