# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BROOKE C. DELENCH
  Plaintiff

    V.

KIMBERLY ARCHIE
  Defendant

Civil action No. 1:18-CV-12549-LTS

## FIRST AMENDED COMPLAINT
### (And jury demand)

## NATURE AND BASIS OF ACTION

This is an action for defamation.

## PARTIES

1.    Plaintiff Brooke C. de Lench ("Ms. de Lench") is an individual residing in Concord, Massachusetts.

2.    Defendant Kimberly Archie ("Ms. Archie") is an individual residing at 11045 Oxnard Street, Hollywood, CA 91606

## JURISDICTION AND VENUE

1.    This Court has original subject matter jurisdiction of this matter pursuant to 15 U.S.C. §1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Ms. de Lench and Ms. Archie are citizens of different states.

2.        This Court has personal jurisdiction over Ms. Archie in that her contacts in the Commonwealth of Massachusetts as she has intentionally availed herself of the laws and protections of the state, by, among other things, organizing and speaking at a cheerleading safety summit at the Omni Parker Hotel in Boston, Massachusetts on April 29, 2011; serving as an expert witness/consultant in a wrongful death suit filed in Middlesex Superior Court; attending and speaking at conference of trial lawyers in Boston on July 23, 2017 on the subject of brain injuries in football; sending the brain of her son, Paul Bright, Jr. ("Paul") to be autopsied by the Boston-based Concussion Legacy Foundation ("CLF") in 2015, encouraging others to donate their brains, or those of members of their family, to CLF for autopsy in Massachusetts for evidence of CTE; and serving on the CLF Family Advisory Board, which, according to the CLF's website, was created to allow family members of Legacy Donors "to have a voice in the operations of the Concussion Legacy Foundation and the Boston University CTE Center."

3.        As described in this Complaint, the actions of Ms. Archie have caused harm in Massachusetts to Ms. de Lench, a Massachusetts resident, and arise out of Ms. Archie's tweets and Facebook posts which were published for viewing by Massachusetts residents.

4.        Venue is proper in this Court under 28 U.S.C. §1391(b)(3), as Ms. Archie is subject to personal jurisdiction in this judicial district.  Venue in the Eastern Division of this Court is proper pursuant to Local Rule 40.1(D)(1)(c).

FACTS

The Parties

Brooke de Lench

5.　　　　Ms. de Lench is a longtime youth sports safety educator, author, documentary filmmaker, journalist, public speaker, and activist.  She is producer/director of the 2013 PBS documentary, *The Smartest Team: Making High School Football Safer*, author of the book, *Home Team Advantage: The Critical Role of Mothers in Youth Sports* (HarperCollins 2006), and Executive Director of MomsTEAM Institute, Inc. ("the Institute"), a 501(c)(3) non-profit, which, through its www.MomsTEAM.com website, has been providing youth sports stakeholders since August 2000 with information on a wide array of youth sports health, safety, nutrition, and sports parenting topics, including head injuries in sports.

https://concussions.smart-teams.org/about-momsteam-institute/

6.　　　　In October 2001, Ms. de Lench received an email from Deron Colby, the grieving uncle of 17-year old California high school football player, Matthew Colby, who had died tragically from Second Impact Syndrome, a usually fatal brain bleed believed to be the result of a second impact to the brain of an athlete while they were still suffering from concussion, two weeks earlier.  He told Ms. de Lench that his Internet research had identified MomsTEAM as the only website addressing the subject of concussions in youth athletes, but he wanted it to do more.  He said that he had read in his research some excellent journal articles written by a Dr. Robert Cantu, who he said was practicing at Emerson Hospital in Concord, Massachusetts – a mile from where Ms. de Lench lived – and wondered whether Ms. de Lench knew Dr. Cantu.

7.          At the time, Ms. de Lench had not heard of or read anything by Dr. Cantu, as he was only writing for his peers, but not doing much of anything to educate sports parents, but immediately contacted him, and Dr. Cantu agreed to work with MomsTEAM as its initial concussion expert.  The ensuing collaboration between MomsTEAM and Dr. Cantu not only helped educate sports parents about the dangers of concussion and second impact syndrome and the ways in which concussions were then managed, but helped Dr. Cantu reach, not just his peers in the medical community, but an entirely new audience of sports parents.

8.          On February 2, 2002, twenty-two parents mourning the recent sports-related deaths of their children and knowing of the work that Ms. de Lench was doing as the Editor-in-Chief of MomsTeam.com to educate parents about ways to prevent catastrophic injury and death while our children play sports, invited Ms. de Lench to attend a three-day meeting in Pennsylvania.

9.          At the meeting, the parents asked if Ms. de Lench and MomsTEAM could do more to educate sports parent about ways to prevent or minimize the risk of catastrophic injury in youth and high school sports, whether MomsTEAM could publish articles about the charities they had set up in their children's memory, and if it could continue to provide parents and the youth sports community with current and reliable sports safety information so that no other children died while playing youth sports.  The parents also stressed the need for a neutral organization like MomsTEAM to serve as an umbrella for the private charities that they each had set up in order to allow them to continue the important work they were doing at the grassroots level to educate people about the critical need for life-saving equipment and safety standards in youth sports.

10.     As a result of the meeting, Ms. de Lench established Teams of Angels, Inc. (https://www.teamsofangels.org/welcome.shtml), a 501(c)(3) non-profit organization supporting families whose children had died or been catastrophically injured while playing sports.  Among Teams of Angels' directors were Angela Ruggiero, a four-time Olympic women's ice hockey medalist and current member of the International Olympic Committee, and Christopher Nowinski, Executive Director of the Concussion Legacy Foundation.

11.     In 2003, in the wake of the death of a high school lacrosse player on Long Island from commotio cordis (an ill-timed blow to the chest causing the player's heart to go into cardiac arrest) and the death of athletes in Pennsylvania and Arizona from sudden cardiac arrest as a result of undetected congenital heart defects and the lack of an onsite automatic external defibrillator, Ms. de Lench spearheaded Teams of Angels' successful "Save a Child's Life - An AED For Every Team" campaign to supply automated external defibrillators at reduced cost to sports teams across the country.

12.     Over the past eighteen years, Ms. de Lench has provided advice and support to numerous families grieving the loss of a child to a catastrophic sports injury, and has educated millions of sports parents, athletes, coaches, sports medicine professionals and athletic trainers on ways to reduce the risk of catastrophic sports injuries, including undetected congenital heart defects such as hypertrophic cardiomyopathy (HCM), commotio cordis, exertional heat stroke, second impact syndrome, and falling soccer goalposts.  She continues to provide support for and consult with families of youth athletes who have suffered catastrophic injury or death playing sports.

13.     Since 2006, Ms. de Lench and MomsTEAM have reported extensively on research concerning chronic traumatic encephalopathy ("CTE"), a neurological disease which has been linked to repetitive head impacts, such as those sustained by athletes playing contact and collision sports, including tackle football.

14.     Most recently, the Institute, with a "Mind Matters" Grand Challenge Grant awarded by the National Collegiate Athletic Association and Department of Defense, launched a website, www.concussions.smart-teams.org, specifically devoted to the subject of head injuries in sports.

Kimberly Archie

15.     According to her LinkedIn biography, Ms. Archie is, among other things, a legal consultant (although she is not an attorney), founder of the National Cheer Safety Foundation, and one of the nation's leading experts in sports risk management.  Ms. Archie is co-founder of the group, Faces of CTE (www.FacesofCTE.com), which, according to its website, is a collaboration of sport families affected by CTE, and is dedicated to "raising awareness and increasing brain donations to further science and research to prevent, treat, and cure CTE."  Ms. Archie is also behind a social media campaign called "Save Your Brain."

16.     Ms. Archie suffered a traumatic brain injury (TBI) in a car accident when she was a teenager.  She freely acknowledges being brain damaged and a TBI survivor and that she continues to suffer from its effects.  Exhibits 1-4.

***

Twitter

17.     Twitter is a social networking and micro-blogging service that allows users to post "tweets" and to "retweet" and "like" others' posts. "A tweet is a short text post … delivered through Internet or phone-based text systems to the author's subscribers." https://help.twitter.com/en/using-twitter/types-of-tweetshttps://help.twitter.com/en/using-twitter/types-of-tweets (in general, a "tweet" is a "message posted to Twitter containing text, photos, a GIF, and/or video"). A "retweet" is simply a repost of another Twitter user's tweet on a user's own profile to show to that user's own followers. https://help.twitter.com/en/using-twitter/retweet-faqs.

18.     For people who live in the United States, the "Twitter User Agreement" is comprised of "Terms of Service", a "Privacy Policy", the "Twitter Rules" and all incorporated policies. https://twitter.com/en/tos.

19.     Twitter's Terms of Service ("Terms") govern a user's access to and use of its services, including its various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and other covered services ("Services"). By using the Services, a user agrees to be bound by the Terms. [https://twitter.com/en/tos].

20.     In order to protect the experience and safety of people who use Twitter, Twitter imposes limitations on the type of content and behavior that it allows. These limitations are set forth in the Twitter Rules. Generally, the Twitter Rules prohibit use of the platform for "any unlawful purposes or in furtherance of illegal activities."

21.     Unlawful purposes and illegal activities include defamation, business disparagement and insulting words. "[I]n order to ensure that people feel safe expressing diverse opinions and beliefs, [Twitter] prohibit[s] behavior that crosses the line into abuse, including behavior that harasses, intimidates, or uses fear to silence another user's voice."

22.     To this end, the Twitter Rules expressly bar "abuse", prohibiting users from engaging in the "targeted harassment" of another user, or inciting other people to do so. Twitter considers it abusive behavior to "attempt to harass, intimidate, or silence someone else's voice."

23.     Twitter also prohibits impersonating individuals, groups, or organizations "in a manner that is intended to or does mislead, confuse, or deceive others. While you may maintain  parody, fan, commentary, or newsfeed accounts, you may not do so if the intent of the account is to engage in spamming or abusive behavior. https://help.twitter.com/en/rules-and-policies/twitter-rules.

24.     Twitter's rationale for prohibiting abusive behavior is as follows: "On Twitter, you should feel safe expressing your unique point of view. We believe in freedom of expression and open dialogue, but that means little as an underlying philosophy if voices are silenced because people are afraid to speak up. In order to facilitate healthy dialogue on the platform, and empower individuals to express diverse opinions and beliefs, we prohibit behavior that harasses or intimidates, or is otherwise intended to shame or degrade others."

25.     Twitter acknowledges that: "In addition to posing risks to people's safety, abusive behavior may also lead to physical and emotional hardship for those affected." https://help.twitter.com/en/rules-and-policies/abusive-behavior

26.     Twitter can suspend or terminate an account or cease providing the user with all or part of the Services at any time for any or no reason, including, but not limited to, if Twitter believes the user has violated the Terms or the Twitter Rules.

27.     Twitter reserves the right to remove content that violates the User Agreement, including for example, content that constitutes or involves "unlawful conduct" or "harassment". https://twitter.com/en/tos

28.     Twitter provides a means to report violations of its Terms and Rules. [https://help.twitter.com/en/rules-and-policies/twitter-report-violation; https://help.twitter.com/forms/abusiveuser ].

29.     Ms. de Lench maintains a social media presence on Twitter (@BrookeDeLench (3,432 followers), @SmartTeams (9,478 followers), @TheSmartestTeam (2,048 followers) and @MomsTEAM (16.2K followers)) and on Facebook.

30.     Like Ms. de Lench, Ms. Archie maintains an active presence on social media. She posts on Twitter under her own name (@kimberlyarchie; 4,213 followers), using the Twitter handles @FacesofCTE (227 followers), @cheersafety and @SaveYourBrain (66 followers). On information and belief, Ms. Archie tweets using a number of anonymous Twitter accounts, including but not limited to, @tackleCTE (21 followers) and @braindamagedinc. She also maintains an active presence on Facebook. https://www.facebook.com/kimberlyarchie.

31.     For a time, Ms. de Lench and Ms. Archie maintained a courteous and professional relationship as youth sports safety advocates and were in regular contact via email.  Exhibits 5-8

32.     On July 11, 2014, Ms. de Lench sent an email to Sharon van Kooten (@concernedmom33), at the time a mutual friend of both herself and Ms. Archie, in which she confided in Ms. van Kooten that she was "troubled by Kimberly and her attempts to take simple tweets off topic and into her own direction, but as many privately pointed out to me last night, she is brain damaged as are many other confused tweeters."  Exhibit 9

33.     Van Kooten responded to Ms. de Lench's email in a Twitter direct (private) message stating that "I can't believe someone said such a mean spirited [sic] thing about Kimberly.  She's very open about the TBI she had a child along w/current health issues. I understand people have different opinions.  Exhibit 10

34.     Ms. de Lench responded via direct message to Ms. Van Kooten, "It wasn't mean spirited. It was an MD follower simply stating the obvious. I was simply imparting knowledge and not looking for her rants." Exhibit 11

35.     Van Kooten responded via direct message, "I still think it was mean spirited and that the doctor who wrote that should be ashamed. I'm sure you disagree & I'm okay with that." Exhibit 12

36.     Ms. de Lench responded via direct message, "You are good to be her friend. Sorry to have passed on our conversation. In our world or research and writing we tend to talk facts." Exhibit 13

37.     Subsequent to their private conversation, Ms. van Kooten shared her email and Twitter private messages, which Ms. de Lench intended to be private and confidential, with Ms. Archie.  The once cordial professional relationship between Ms. de Lench and Ms. Archie turned sour.

38.     On September 1, 2014, Ms. Archie's son Paul died tragically in a motorcycle accident.

39.     As alleged in the Third Amended Complaint in a class action lawsuit in which Ms. Archie is lead plaintiff captioned <u>Archie v. Pop Warner Little Scholars, et. al.</u> (Case. No. 2:16-cv-6603-PSG-PLA), currently pending in the United States District Court for the Central District of California, Paul was later found in an autopsy performed by Dr. Ann McKee ("Dr. McKee") at the VA-BU-CLF Brain Bank in Bedford, Massachusetts, to have been suffering at the time of his death from so-called "Stage 1" CTE.

40.     Ms. Archie was on Twitter responding to tweets about the accident the next day.  In the days after her son's death, she was tweeting about the NFL settlement, youth football helmets, and the death of an athlete from heat stroke. Exhibits 14, 15.

41.     On September 3, 2014, Ms. de Lench reached out in an email to Ms. van Kooten, after hearing a rumor that Ms. Archie's son may have died. "But from her tweets about NFL and heat stuff – it seems it may be a bad rumor. Do you know?" Exhibit 16

42.     Ms. van Kooten responded in an email that day to confirm that it was true: Ms. Archie's son had indeed died in a motorcycle accident two days earlier.  Exhibit 17

43.     Ms. de Lench emailed Ms. van Kooten to ask her to let Ms. Archie know that she was profoundly saddened by the news.  Exhibit 18

44.    In an email to Ms. Archie dated September 4, 2014, Ms. de Lench expressed condolences on the loss of her son.  Exhibit 19

45.    Ms. Archie responded in an email to Ms. de Lench dated September 16, 2014 in which she viewed Ms. de Lench's email as intended to hurt and exploit her as a grieving mother.  Exhibit 20

46.    Ms. de Lench responded to Ms. Archie in an email dated September 21, 2014 stating that her words of condolence were sincere, and that she meant no harm to Ms. Archie.  Exhibit 21

47.    In a tweet on or about November 10, 2015, Sony Pictures announced that it had selected MomsTEAM as its charity of choice in connection with a social media campaign dubbed "Dance or Donate" modeled on the ALS "Ice Bucket Challenge" in support of its forthcoming movie, *Concussion*, starring Will Smith as Dr. Bennet Omalu, the forensic neuropathologist whose discovery of CTE in the brains of former National Football League players had brought the disease into the national consciousness a decade earlier.  Exhibit 22

48.    Ms. Archie responded to Sony's announcement with a tweet asking, "MomsTEAM doesn't believe in CTE so how is this possible?" She later retweeted a post by one of her followers, @NFLObjectors, suggesting that Sony cancel its promotion with MomsTEAM – which she characterized as a "CTE denier" – and accused Ms. de Lench of "spitting on [her] dead son [sic] grave."  Exhibit 23

49.    In a tweet later that day, Ms. Archie asked her friends for help in taking on Ms. de Lench, whom she characterized as a "monster" who had been "torment[ing]" her since her son died. Exhibit 24

50.     In addition, Ms. Archie sent an email to Sony, completely unprompted, stating that, "[d]ue to her very public stance that CTE is not directly related to hits in football and that it ever blown [sic] by the media, other CTE moms along with media such as Ken Belson of NYT contacted me to see it is was could [sic] even possible [sic] be true." Ms. Archie attached an email allegedly showing that Ms. de Lench is on social media "making CTE denial comments misleading parents around the world about the dangers of football." Ms. Archie closed the letter by stating that she "thought it was important to you to know so that you may continue to keep the integrity of the movie and getting out the truth about CTE." Exhibit 25

51.     On November 11, 2015, Ms. de Lench emailed Ms. Archie a letter from her attorney demanding that she cease and desist defaming her and tortuously interfering with MomsTEAM's partnership with Sony.  Five minutes later, Ms. Archie responded dismissively in an email stating, "I can't take this serious [sic]."  Exhibits 26, 27

52.     On November 11, 2015, approximately five hours after Ms. de Lench's attorney sent Ms. Archie a cease and desist letter, someone using the Twitter account @ricesposito responded to Sony's announcement of its partnership with MomsTEAM by tweeting, "This is the new partnership for the @concussionmovie? Isn't the point of the movie to call out those who deny CTE?"  Exhibits 28

53.     On November 12, 2015, Ms. de Lench emailed Enrico Esposito ("Mr. Esposito"), the supposed owner of the @ricesposito Twitter account, to request that he delete his tweet of the previous day, surmising – correctly, as it turned out – that it was "more than likely encouraged by Ms. Kimberly Archie who has been issued a cease and desist letter by our

staff attorney for posting defamatory comments on Twitter about MomsTEAM Institute, Inc. and for serious business interference issues."  Exhibit 29

54.     Mr. Esposito responded in an email by stating that he had "not been on [Twitter] in quite some time" and had not Teeted [sic] anything." He asked what he had to do to correct the situation.  Exhibit 30

55.     Ms. de Lench responded in an email to Mr. Esposito in which she asked him to confirm that he was a friend of Ms. Archie, and, if so, to ask her who was tweeting using his Twitter account, as the tweets appeared to dovetail with Ms. Archie's attacks against Ms. de Lench, and whether she had access to his Twitter password.  Exhibit 31

56.     Mr. Esposito responded in an email in which he stated that he had just talked to Ms. Archie, that she was deleting the post and closing his account and apologized for the "confusion."  Exhibit 32

57.     Ms. de Lench responded in an email a short time later in which she stated that "'confusion' [was] the wrong word.  [Ms. Archie] is interfering with our business," and demanded that he tweet an apology. Exhibit 33

58.     Mr. Esposito responded in an email stating that his "tweeter account was utilized inappropriately and unauthorized without my knowledge.  The tweet post has been taken down and my account has been closed.  I apologize to MomsTeam for the inappropriate tweet." Exhibit 34

59.     In a Facebook post on December 31, 2015, Ms. Archie stated that Ms. de Lench had called a reporter to tell him that she had lied about her son having CTE.  One of her Facebook followers, Sharyne Wallace, posted a comment dubbing Ms. de Lench "'Grinch'

deLench and stating that striking out at a suffering parent as "deplorable, despicable, and disgraceful."  Exhibit 35

60.	Ms. Wallace was the head of the Wise Foundation in Birmingham Alabama. She had made a point of speaking with Ms. de Lench after de Lench spoke at a concussion conference at the United Nations and told her she planned to make a significant donation to MomsTeam Institute.  Ms. de Lench were in discussions about the donation when Ms. Wallace abruptly stopped talking with her.

61.	Further down in the comments section of the same December 29, 2015 Facebook post, Ms. Archie stated that Sony had requested in writing the email Ms. de Lench allegedly sent discrediting her for having brain damage and her tweets denying CTE and suicide.  She claimed that Ms. de Lench, calling herself an advocate for grieving parents of dead athletes, had a history of defaming and harassing victims, and that Ms. Archie was "not the first grieving mom she has done this to.  There's a laundry list going back 10+ years."

62.	Further down in the comment section of the same December 29, 2015 Facebook post, Ms. Archie stated that Ms. de Lench was "really [just] a personal aggravation that upsets me as a mother protecting my child's memory, not really worth taking my time away from helping lawsuits that will bring victims justice. If she keeps contacting media and saying my son didn't have CTE I may have to rethink that."

63.	In a Facebook post on December 30, 2015, Ms. Archie linked to a December 30, 2015 article by Irv Muchnick claiming that Ms. de Lench had smeared Ms. Archie by telling a *Newsweek* reporter that Ms. Archie had lied to the reporter in saying that her son had CTE.  Exhibit 37

64.     In a tweet on January 25, 2016, Ms. Archie stated that Ms. de Lench had "told reporters I lied re my son's CTE."  Archie Aff., Ex. 3A.

65.     Later that same day, Teddy Cutler ("Mr. Cutler"), the journalist who had written the December 28, 2015 *Newsweek* article about the *Concussion* movie, an article which included information obtained in an interview with Ms. Archie, wrote in an email to Ms. Archie, Ms. de Lench, and Mr. Muchnick to "correct an error of my making that has since been propagated on social media and blogs and caused damage to the reputation of Brooke de Lench and MomsTEAM" by "mak[ing] clear that Ms. de Lench sought only to correct my point [in the article] that football alone might cause CTE and not to question [Ms. Archie]'s son's [CTE] diagnosis."  He went on to inform Ms. Archie that Ms. de Lench "never claimed to me that you lied about your son's CTE."  The email concluded with the following statement: "I accept responsibility for this misunderstanding and would like to reiterate that Ms. de Lench never questioned the CTE diagnosis of [Ms. Archie's] son."  Exhibit 38

66.     In an email to Ms. de Lench dated April 11, 2016 with the subject line, "The internet isn't invisible we know this was posted by you. Keep bashing my disability", Ms. Archie accused Ms. de Lench of posting a comment on the *Washington Post* under an anonymous Twitter account (@eauxcalmes.3) which asked, in reference to a post by Ms. Archie, what she was a legal expert in, whether she was talking about trauma to her head, whether anything else could cause a kids head to shake violently, and did she raise him alone or was there a father who had custody.  Exhibit 39.  The post was not made by Ms. de Lench.

67.     On November 13, 2016, Ms. Archie claimed in an email to Ms. de Lench that a Twitter account (@#OkayestOfMoms) had been identified as being controlled by Ms. de

Lench and stated that she would not tolerate Ms. de Lench's alleged "continued harassment or defamation."  Exhibit 40

68.     Ms. de Lench responded in an email to Ms. Archie stating that she had "absolutely no idea who [the] twitter account belongs to but I will go in and like everything they said and become one of their friends."  Exhibit 41

69.     Two hours later, Ms. Archie sent Ms. de Lench another email in which she stated that Ms. de Lench was "not fooling anyone and by liking [her] own phony posts [she] just further implicate[d] [herself] in [her] ongoing harassment since [Ms. Archie's son's death]. Exhibit 42

70.     On November 13, 2016, Ms. de Lench then sent Ms. Archie an email recommending that Ms. Archie get some professional help and stating that, far from being the victim of online harassment and libel, it was Ms. Archie who was harassing and slandering her, and that when she realized the Twitter accounts were not hers, she expected Ms. Archie to make a public apology to Sony, and everyone else she had "dragged through her dramas." Exhibit 43

71.     On November 20, 2016, Ms. Archie tweeted that she had a "great meeting today with private investigators for my case against the person who keeps harassing me online."  On information and belief, the person she was referring to in her tweet was Ms. de Lench.  Exhibit 44

72.     Five days later, on November 25, 2016, Mr. Muchnick claimed that Twitter had busted a fake account which was allegedly harassing mothers of dead football youth, and, in a blog post on his website, www.concussioninc.net, elaborated on that claim by

stating that, earlier that week, Twitter had purged @carryon123456, which he said was one of the several "troll accounts" which Brooke de Lench of the MomsTEAM Institute was using to harass critics of youth football – most particularly "advocates who are mothers of dead players." Mr. Muchnick went on to state that the "social media company said it had investigated and suspended @carryon123456 'as it was found to be participating in abusive behavior.'" In addition, Mr. Muchnick repeated his claim that Ms. de Lench had smeared "a family that had lost a son to CTE" to the *Newsweek* reporter.

73. On information and belief, Mr. Muchnick obtained the information about Twitter's alleged suspension of @carryon123456 and alleged harassment of critics of youth football, particularly of mothers of dead players, from Ms. Archie. Exhibits 45, 46

74. On November 25, 2016, in response to a tweet by @AllConcussion requesting that the individual posting under the Twitter handle @OkayestofMoms not include her on any tweet directed negatively against Ms. Archie or anyone, Ms. Archie tweeted, "@AllConcussion Just Brooke Delench using multiple accounts to harass me. Twitter shut one of them down, but she keeps at it." Exhibits 47, 48

75. In a tweet on December 2, 2016, responding to a tweet by @OkayestOfMoms questioning whether CTE really was to blame for her son's death, Ms. Archie informed her Twitter followers that she had "blocked every 1 of Ms. de Lench's 'phony accounts'" and vowed that Ms. de Lench would not "get away with" mocking her son's death. Exhibit 49

76. In a tweet on December 19, 2016, in response to a tweet by @OkayestOfMoms asking whether CTE really was to blame for Paul Bright's death (quoting

the title of an LA Times article), Ms. Archie stated, "I think I have blocked every 1 of her phony accounts yet she's obsessed.  @brookedlench you won't get away with mocking my son's death."  Exhibit 50

77.	In a tweet on December 19, 2016, Ms. Archie falsely asserted that Ms. de Lench had set up a phony account to "mock [her] son's death and defame [her] every day," and asked, "Isn't his death enough?" and listed all of the people who "follow a phony account set up by @BrookedeLench to mock my son's death & defame me every day. His death isn't enough?" Exhibit 51

78.	In a tweet on December 21, 2016, Ms. Archie, in response to a tweet by @OkayestOfMoms linking to the August 12, 2016 story in the *Los Angeles Times* in which her son Paul's father, Paul Bright, Sr., was quoted as saying that the notion that CTE caused his son's death was "irresponsible," stated, "The holiday torment by Brooke de Lench continues." Exhibit 52

79.	In a Facebook post on or about December 22, 2016 (since deleted), Ms. Archie stated, "And people wonder why people commit suicide when a someone like Brooke de Lench can stalk and troll a grieving mom about her dead son and no one says or does anything. I just have to take it, day after day."  In the comments section to the Facebook post, Ms. Archie stated that "I can handle her making fun of me, but mocking Paul's death is too much for me."  In a later comment, Ms. Archie stated, "I just know I have gotten endless emails, online harassment and others join in and help her whether it be from her real account or fake ones.  She has been doing it for over two years."  Later, she states, "It isn't one incident, it

is every day now and has been going on for more than two years.  She started with an evil email only two days after he died. I'm just at my wits end."

80.	When asked by one of her Facebook friends if she had written to FB/Social Media about booting Ms. de Lench for harassment, or at least block her, Ms. Archie responded by stating, "[s]he does it on Twitter and mostly from phony accounts," and that she had "blocked her as many ways as I can. She still tags me or opens new accounts or gets around it somehow."  Her Facebook friend responded, "She should hang her head down for being a cruel, mean spirited person with too much time on their hands.  Sad she has no productive sense of purpose in her life. What grown up goes around getting fake accounts. Sounds like child behavior like prank phone calling."

81.	A number of Ms. Archie's other Facebook friends then commented that they couldn't imagine "how can someone be so cruel to mock a grieving mother," and that Ms. de Lench should be "ashamed of herself for ever mocking anyone w a loss."

82.	Another then asks, "Is it inappropriate to say … I WOULD LIKE TO BEAT HER ASS'  [H]er stupidity will come back to haunt her," with another saying, "Some people have a sick twisted mind and get off on taunting and harassing others."

83.	In a later comment Ms. Archie stated that Ms. de Lench "has been going after grieving moms for years as some sort of tactic to keeping what she perceives as competition away.  … She is basically a CTE denier, like a Sandy Hook truther. She has been sending emails for a couple of years as well as setting up phony anonymous twitter accounts such as the one here [referring to the @OkayestOfMoms].  She even sent an email two days after [her son's] death as soon as she found out we donated his brain."

84.     In a later comment to her Facebook post, Ms. Archie also stated, "So this obsessed stalker Brooke de Lench founder of the nonprofit Momsteam continues to mock Paul's death. Now she has almost a dozen twitter accounts of which I have blocked her from all of them. Yet she posts this today on one of her phony accounts.  Twitter did shut down one account but with new ones constantly popping up it's impossible to stop it." Exhibit 53

85.     Ms. Archie's accusations regarding Ms. de Lench prompted a number of her followers to threaten physical violence against Ms. de Lench, with one saying in a tweet that she would "like to beat her ass" – prompting another follower to respond by saying she would "hold her down"; another saying that Ms. de Lench was a "bitch" who "needs to be slapped. Hard. Upside her neck (because we don't hit heads.) Knock her cruelty right out of her," prompting a response from another of Ms. Archie's followers that she was "actually quite ok w inflicting head injuries on her. Maybe putting her in the hospital will make her see the error of her ways … At least it will shut her up."  Ms. Archie stated that she was "exhausted from the constant hits by the zealots who keep mocking Paul's death."   Exhibit 53

86.     Ms. Archie's comments on Facebook on December 22, 2016 prompted one of her friends to state that @OkayestOfMoms had "built a horrible reputation for being a harasser/troll who preys on grieving families. STOP IT!"  Exhibit 54

87.     In a tweet on April 15, 2018, Ms. Archie, tweeting as @FacesofCTE, went out of her way to attack Ms. de Lench.  Responding to a tweet by @ChungSports about an upcoming NYU concussion summit which Ms. de Lench was planning to attend as a panelist on CTE, Ms. Archie asked, "Will you continue to attack CTE families?" Exhibit 55

88.	When @DanConner76 tweeted about the number of concussions in youth soccer and asked about efforts to eliminate youth soccer, Ms. Archie, tweeting as @FacesofCTE, disputed the statistics and closed, gratuitously, with "Nice try, Brooke." Exhibit 56

89.	In an undated tweet responding gratuitously to a tweeter exchange between @DanConner76 and journalist @patrick_hruby in or around June 2018, Ms. Archie volunteered that @DanConner76 was "our good buddy Brooke's troll account." Exhibit 57

90.	Responding to a June 9, 2018 tweet by @BrendaTracy, Ms. Archie stated that "I have [a] woman who claims to be an advocate for children in sports herself. She spends endless time using and creating new accounts. I block her or get an account suspended, she just makes another one. Exhibit 58

91.	In a tweet on June 19, 2018 responding to a tweet by @kewlhandluke11, @tackleCTE again asked, "Brooke de Lench: when are you going to stop trolling CTE families from burner accounts? You realize that this is traceable, right?" Exhibit 59

92.	In a tweet on June 20, 2018, @tackleCTE asked Ms. de Lench to "spare us the CTE denier trolling from a phony account." Exhibit 60

93.	In a tweet on June 20, 2018, @tackleCTE stated, "Maybe you would be taken serious [sic] Brooke de Lench if you weren't hiding behind a kewlhandluke11 burn account." Exhibit 61

94.	Responding to a tweet by @kewlhandluke11, @tackleCTE tweeted, "Again Brooke de Lench of MomsTEAM aka Luke Johnson burner account you are only burying yourself with this CTE denier nonsense." Exhibit 62

95.     In a tweet on June 21, 2018, Ms. Archie said, apropos of nothing and in response to a tweet by @StopCTE, that "Just so you know, Luke Johnson is just a fake account for Brooke de Lench." Exhibit 63

96.     In a tweet on June 26, 2018, @tackleCTE, responding to a tweet by Ms. de Lench reposting an article by an MomsTEAM editor entitled "CTE: Is the Media Scaring Young Athletes to Death?", asked, "Is this why you troll CTE families, mock them about their dead children?"  Exhibit 64

97.     In a tweet on July 25, 2017, Ms. Archie stated that a post from an unidentified Twitter account was Brooke de Lench: "We all know how it is.  Same person who has been obsessed with grieving moms & their dead kids for more than a decade!"  Exhibit 65

98.     On August 2, 2017, Ms. Archie exchanged tweets with Cyndy Feasel, the ex-wife of an NFL player diagnosed after death to have been suffering from CTE, referring to a "so called advocate team for 'moms' hiding behind anonymous twitter accounts" and including the hashtags #subpoena #coming soon."  Ms. Archie went on to accuse Ms. de Lench of "[s]uper creepy stalker type stuff" and being "unstable," to which Ms. Feasel responded, "It's just unnecessary and a mental condition that needs treatment." Ms. Archie then tweeted, "It will all come out soon and then what? How will they save face then? Trolling grieving moms/families is lower than low. #crazytown." Exhibit 66

99.     On August 16, 2018, two of Ms. Archie's Twitter followers, Kent Johnson and NFLObjectors, asked in response to a tweet by @DanConner76 whether he was the new Twitter handle of a "goofy woman" who supposedly had a dozen or so such handles, to which

Ms. Archie replied that @DanConnor76 was Ms. de Lench, and that she was also Luke Johnson (@kewlhandluke11). Exhibit 67

100.  Eight days later, on August 24, 2018, a member of Ms. Archie's cabal, Kent Johnson (@37919K) joined the attack on Ms. de Lench, stating, categorically, that "the imposter behind the "Dan Conner" and "Luke Johnson" accounts was pursuing the same line of questioning just the other day. I hope you'll report your concerns about @ChrisNowinski1 to @BrookedeLench from MomsTEAM @MomsTEAM." Exhibit 68

101.  In a tweet on August 20, 2018, Ms. Archie, tweeting as @FacesOfCTE, stated, "Well Brooke you have more than one troll account and have had so many shut down previous to this one. I'm pretty sure you are aware of what one is." Exhibit 69

102.  In a tweet on September 15, 2018, Ms. Archie said it was "[h]ilarious for a Sybil to use who [sic] own article and tweet it out from a phony burner account. Brooke thinks she is sneaky, but we all know it's just her from another alias." Exhibit 70

103.  That same day, Ms. Archie, tweeting as @FacesofCTE, stated that Ms. de Lench was a troll posing as Peter Luke or whoever else she plays today that you interact with as if they are all different. Exhibit 71

104.  On September 20, 2018, Ms. Archie, tweeting as @FacesofCTE, asked Ms. de Lench, if she wanted to be a "CTE denier," to use her real twitter account. Exhibit 72

105.  In a tweet on October 21, 2018, Ms. Archie went out of her way to identify Brooke de Lench as the person behind the @Dan Conner76 and @KewlHandLuke11 Twitter accounts, gratuitously stating, in a twitter thread which began in February 2018, that "DanConnor76, and KewlLuke and Peter whatever are all Brooke de Lench so it's pointless to

discuss this with someone who won't speak publicly but hides behind burner accounts."
Exhibit 73

106.　　　In a tweet on January 11, 2019, @TDTommy33 stated that @kewlhandluke11 Luke Johnson is @brookedelench hiding behind the name tell Luke to call you and tell who he played for (and posted a large picture of Ms. de Lench).  Exhibit 74

107.　　　@kewlhandluke11 stated that he was a former college football player just like Tommy who doesn't appreciate others blaming all of their problems on football.

108.　　　@TDTommy33 replied to @kewlhandluke11 @AllConcussion and 14 others by stating that "Luke Johnson is @brookedelench hiding behind a name tell Luke to call you and tell who he played for. You stated that you were a former college football player Luke what college did you play for was there a women's team? Or did you play with the men?

109.　　　On January 20, 2019, @TDTommy33 stated "@kewlhandluke11 @saveyouthfbca @kimberlyarchie says the fake account being investigated by twitter! and then that "After associating the account with a known twitter abuser who trolls those suffering the loss of a child or themselves, this person threatened to sue me, when I stated that it seemed odd that Luck [sic] stopped commenting, they one wanting to sue proudly stated "nothing shuts them up!"

110.　　　On January 28, 2019, Ms. de Lench sent @TDTommy33 a direct private Twitter message to inform him that she had absolutely nothing to do with any false accounts on Twitter nor had she ever had anything to do with them, and asked he could tell her how he thought she was Luke and how all this all began.  Tommy responded with a direct message from Ms. Archie, tweeting as @braindamagedinc, stating that "Luke Johnson is

@brookedelench hiding behind a name tell Luke to call you and tell who he played for."

When Ms. de Lench sent him a copy of the Complaint in this action, Tommy said he would "like to apologize I have misjudged you."

<u>COUNT I</u>

<u>(Libel: Facebook Post and Comments of December 31, 2015)</u>

111.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

112.     Ms. Archie's Facebook posts of December 31, 2015 (Ex.35) were defamatory because:

      a.  They held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
      b.  They were made to at least one other individual other than Ms. de Lench;
      c.  They did not relate to a matter of public concern, and, if they did relate to a matter of public concern, were both defamatory and false; and
      d.  Ms. de Lench has suffered damages as a result.

113.     Ms. Archie's Facebook posts of December 31, 2015 concerning Ms. de Lench do not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

114.     Ms. Archie's Facebook posts of December 31, 2015 do not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but were made on social media.

115.     Ms. Archie's Facebook posts of December 31, 2015 concerning Ms. de Lench did not constitute written statements in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in

that there were not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's Facebook posts of December 31, 2016 and any legislative, executive, or judicial body or any governmental proceeding, and there no objective indicia of an intent by Ms. Archie in posting comments on her Facebook page to influence a governmental proceeding.

116.    Ms. Archie's Facebook posts of December 31, 2015 were not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

117.    Ms. Archie's Facebook posts of December 31, 2015 were not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

118.    Ms. Archie's Facebook posts of December 31, 2015 lacked any objectively reasonable factual support because there was no objectively reasonable basis for her assertion that the tweet about which complained from @OkayestOfMoms was authored by Ms. de Lench or that it was harassing in any way.

119.    Ms. Archie's Facebook posts of December 31, 2015 caused Ms. de Lench actual injury in that the posts caused her to fear for her physical safety and caused her to suffer emotional and reputational harm.

120.    Ms. de Lench's defamation claim regarding Ms. Archie's Facebook posts of December 31, 2016 is not brought primarily to chill any legitimate petitioning activity by

Ms. Archie, but rather to seek damages for the personal harm she suffered from Ms. Archie's posts.

121.     Ms. Archie's Facebook posts of December 31, 2015 contain assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to whether Ms. de Lench told the *Newsweek* reporter that Ms. Archie had lied about Ms. Archie's son having CTE, whether Sony had requested in writing an email Ms. de Lench had allegedly sent discrediting Ms. Archie for having brain damage and her tweets denying the link between CTE and suicide.

122.     Ms. Archie's Facebook posts of December 31, 2015 state and/or imply knowledge of objectively verifiable information and/or access to information about the ownership of the @OkayestOfMoms Twitter account not available to others identifying Ms. de Lench as the owner.

123.     Ms. Archie's Facebook posts of December 31, 2015 were made with actual malice in that they were made either with Ms. Archie's actual knowledge of their falsity, a high degree of awareness of their probable falsity, or with reckless disregard of their truth or falsity, and were published in furtherance of an concerted campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT II</u>

<u>(Libel: Tweet of January 25, 2016)</u>

124.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

125.    Ms. Archie's tweet of January 25, 2016 (Archie Aff., Ex. 3A) – that Brooke de Lench had told reporters she lied about her son's CTE – was defamatory because:

a.   It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
b.   It was made to at least one other individual other than Ms. de Lench;
c.   It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
d.   Ms. de Lench has suffered damages as a result of the tweet.

126.    Ms. Archie's tweet of January 25, 2016 concerning Ms. de Lench does not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

127.    Ms. Archie's tweet of January 25, 2016 does not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

128.    Ms. Archie's tweet of January 25, 2016 concerning Ms. de Lench does not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of January 25, 2016and any legislative, executive, or judicial body or any governmental proceeding, and there no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

129.     Ms. Archie's tweet of January 25, 2016 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

130.     Ms. Archie's tweet of January 25, 2016 is not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

131.     Ms. Archie's tweet of January 25, 2016 lacks any objectively reasonable factual support because she was not tweeting from the Twitter account, @OkayestOfMoms, and there is no objectively reasonable basis for her assertion that she was being harassed.

132.     Ms. Archie's tweet of January 25, 2016 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

133.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of January 25, 2016 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered from Ms. Archie's tweet.

134.     Ms. Archie's January 25, 2016 tweet contains assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to whether Ms. de Lench had told reporters that Ms. Archie had lied about her son's CTE and did not constitute imaginative expression or rhetorical hyperbole.

135.     Ms. Archie's tweet of January 25, 2016 states and/or implies knowledge of objectively verifiable information and/or access to information about whether Ms. de Lench had told reporters that Ms. Archie had lied about her son's CTE.

136.     Ms. Archie's tweet of January 25, 2016 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a general scheme by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT III

### (Libel: Tweet of November 25, 2016)

137.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

138.     Ms. Archie's tweet of November 26, 2016 (Exhibits 47, 48) – that Brooke de Lench was "using multiple accounts" [including @OkayestOfMoms] to "harass me" and that "Twitter shut one of them down, but she keeps at it" – was defamatory because:

    a.  It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
    b.  It was made to at least one other individual other than Ms. de Lench;
    c.  It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
    d.  Ms. de Lench has suffered damages as a result of the tweet.

139.     Ms. Archie's tweet of November 26, 2016 concerning Ms. de Lench does not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

140.     Ms. Archie's tweet of November 26, 2016 does not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

141.     Ms. Archie's tweet of November 26, 2016 concerning Ms. de Lench does not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of November 16, 2016 and any legislative, executive, or judicial body or any governmental proceeding, and there no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

142.     Ms. Archie's tweet of November 26, 2016 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

143.     Ms. Archie's tweet of November 26, 2016 is not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

144.     Ms. Archie's tweet of November 26, 2016 lacks any objectively reasonable factual support because she was not tweeting from the Twitter account, @OkayestOfMoms, and there is no objectively reasonable basis for her assertion that she was being harassed.

145.     Ms. Archie's tweet of November 26, 2016 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

146.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of November 26, 2016 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered from Ms.Archie's tweet.

147.     Ms. Archie's November 26, 2016 tweet contains assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to the identity of the individual who opened such account, and whether the tweet by @OkayestOfMoms was harassing, and did not constitute imaginative expression or rhetorical hyperbole.

148.     Ms. Archie's tweet of November 26, 2016 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the accounts not available to others which identified Ms. de Lench as the owner.

149.     Ms. Archie's tweet of November 26, 2016 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a general scheme by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT IV</u>

(<u>Libel: Tweet of December 2, 2016</u>)

150.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

151.     Ms. Archie's tweet of December 2, 2016 (Ex. 76) – that she had "blocked every 1 of her phony accounts" and vowed that Ms. de Lench would not "get away with" "mocking her son's death" was defamatory because:

    a. It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
    b. It was made to at least one other individual other than Ms. de Lench;
    c. It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
    d. Ms. de Lench has suffered damages as a result of the tweet.

152.     Ms. Archie's tweet of December 2, 2016 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

153.     Ms. Archie's tweet of December 2, 2016 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

154.     Ms. Archie's tweet of December 2, 2016 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of December 2, 2016 and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

155. Ms. Archie's tweet of December 2, 2016 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

156. Ms. Archie's tweet of December 2, 2016 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

157. Ms. Archie's tweet of December 2, 2016 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from multiple phony accounts; or that Ms. de Lench was mocking her son' death.

158. Ms. Archie's tweet of December 2, 2016 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

159. Ms. de Lench's defamation claim regarding Ms. Archie's tweet of December 2, 2016 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

160. Ms. Archie's December 2, 2016 tweet contains assertions of fact – whether she had blocked every one of Ms. de Lench's phony accounts, and whether Ms. de Lench was mocking Ms. Archie's son's death – and did constitute imaginative expression or rhetorical hyperbole.

161.     Ms. Archie's tweet of December 2, 2016 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others, and objectively verifiable information about whether Ms. de Lench was mocking her son's death.

162.     Ms. Archie's tweet of December 2, 2016 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT V

### (Libel: Tweet of December 19, 2016)

163.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

164.     Ms. Archie's tweet of December 19, 2016 (Ex. 50) – that Brooke de Lench had set up a phony account to "mock [her] son's death and defame [her] every day," listing all the people who followed @OkayyestofMoms, the "phony account set up by Brooke de Lench to mock my son's death & defame me every day" – was defamatory because:

   a. It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
   b. It was made to at least one other individual other than Ms. de Lench;
   c. It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
   d. Ms. de Lench has suffered damages as a result of the tweet.

165.     Ms. Archie's tweet of December 19, 2016 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

166.     Ms. Archie's tweet of December 19, 2016 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

167.     Ms. Archie's tweet of December 19, 2016 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of December 19, 2016 and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

168.     Ms. Archie's tweet of December 19, 2016 was not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

169.     Ms. Archie's tweet of December 19, 2016 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

170.     Ms. Archie's tweet of December 19, 2016 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from that phony account; or that any tweet from @OkayestOfMoms was mocking her son;

171.     Ms. Archie's tweet of December 19, 2016 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

172.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of December 19, 2016 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

173.     Ms. Archie's December 19, 2016 tweet contains assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to the identity of the individual who opened such account, whether the tweet by @OkayestOfMoms was harassing or mocked Ms. Archie's son's death; nor did Ms. Archie's tweet constitute imaginative expression or rhetorical hyperbole.

174.     Ms. Archie's tweet of December 19, 2016 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the accounts not available to others which identified Ms. de Lench as the owner, and objectively verifiable information about whether any of @OkayestOfMoms' tweets were harassing.

175.     Ms. Archie's tweet of December 19, 2016 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of

awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT VI</u>

<u>(Libel: Facebook Post and Comments of December 22, 2016)</u>

176.    Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

177.    Ms. Archie's Facebook posts of December 22, 2016 (Ex. 53) were defamatory because:

   a. They held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
   b. They were made to at least one other individual other than Ms. de Lench;
   c. They did not relate to a matter of public concern, and, if they did relate to a matter of public concern, were both defamatory and false; and
   d. Ms. de Lench has suffered damages as a result.

178.    Ms. Archie's Facebook posts of December 22, 2016 concerning Ms. de Lench do not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

179.    Ms. Archie's Facebook posts of December 22, 2016 do not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but were made on social media.

180.    Ms. Archie's Facebook posts of December 22, 2016 concerning Ms. de Lench did not constitute written statements in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in

that there were not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's Facebook posts of December 22, 2016 and any legislative, executive, or judicial body or any governmental proceeding, and there no objective indicia of an intent by Ms. Archie in posting comments on her Facebook page to influence a governmental proceeding.

181. Ms. Archie's Facebook posts of December 22, 2016 were not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

182. Ms. Archie's Facebook posts of December 22, 2016 were not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

183. Ms. Archie's Facebook posts of December 22, 2016 lacked any objectively reasonable factual support because there was no objectively reasonable basis for her assertion that the tweet about which complained from @OkayestOfMoms was authored by Ms. de Lench or that it was harassing in any way.

184. Ms. Archie's Facebook posts of December 22, 2016 caused Ms. de Lench actual injury in that the posts caused her to fear for her physical safety and caused her to suffer emotional and reputational harm.

185. Ms. de Lench's defamation claim regarding Ms. Archie's Facebook posts of December 22, 2016 is not brought primarily to chill any legitimate petitioning activity by

Ms. Archie, but rather to seek damages for the personal harm she suffered from Ms. Archie's posts.

186.     Ms. Archie's Facebook posts of December 22, 2016 contain assertions of fact capable of being proven true or false as there is a single, objectively correct answer as to the identity of the individual who opened the @OkayestOfMoms Twitter account, and whether Brooke de Lench was mocking her son's death; whether Ms. de Lench had been engaging in online harassment of Ms. Archie for two years; whether such harassment was every day; whether the email Ms. de Lench sent Ms. Archie two days after her son's death was "evil"; whether Ms. de Lench opens new accounts after Ms. Archie blocked her; whether Ms. de Lench tagged her in tweets; whether Ms. de Lench had been "going after grieving moms for years"; whether Ms. de Lench knew sent the email to Ms. Archie two days after he died as soon as she found out that Ms. Archie was donating Paul's brain to the Concussion Legacy Foundation to determine whether he had CTE; whether Ms. de Lench had "almost a dozen twitter accounts" and posted from one of them today; whether Twitter shut down one of Ms. de Lench's accounts but Ms. de Lench kept opening new ones.

187.     Ms. Archie's Facebook posts of December 22, 2016 state and/or imply knowledge of objectively verifiable information and/or access to information about the not available to others.

188.     Ms. Archie's Facebook posts of December 22, 2016 were made with actual malice in that they were made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of their probable falsity, or with reckless disregard of their truth or falsity, and were published in furtherance of an concerted campaign by Ms. Archie to defame

or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT VII

### (Libel: Tweet of June 9, 2018)

189.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

190.     Ms. Archie's tweet of June 9, 2018 (Ex. 58) – that "I have [a] woman who claims to be an advocate for children in sports herself.  She spends endless time using and creating new accounts.  I block her or get an account suspended, she just makes another one" – was defamatory because:

   a.     It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
   b.     It was made to at least one other individual other than Ms. de Lench;
   c.     It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
   d.     Ms. de Lench has suffered damages as a result of the tweet.

191.     Ms. Archie's tweet of June 9, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

192.     Ms. Archie's tweet of June 9, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

193.     Ms. Archie's tweet of June 9, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a

legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of [          ] and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

194.        Ms. Archie's tweet of June 9, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

195.        Ms. Archie's tweet of June 9, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

196.        Ms. Archie's tweet of June 9, 2018 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from multiple phony accounts; or that Ms. de Lench was mocking her son' death.

197.        Ms. Archie's tweet of June 9, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

198.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of June 9, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

199.     Ms. Archie's June 9, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

200.     Ms. Archie's tweet of June 9, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others.

201.     Ms. Archie's tweet of June 9, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT VIII</u>

<u>(Libel: Tweet of June 19, 2018)</u>

202.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

203.     Ms. Archie's tweet of June 19, 2018 (Ex. 59) – "Brooke de Lench: when are you going to stop trolling CTE families from burner accounts? You realize that this is traceable, right? – was defamatory because:

   a.     It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
   b.     It was made to at least one other individual other than Ms. de Lench;

c.  It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and

d.  Ms. de Lench has suffered damages as a result of the tweet.

204.  Ms. Archie's tweet of June 19, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

205.  Ms. Archie's tweet of June 19, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

206.  Ms. Archie's tweet of June 19, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of [         ] and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

207.  Ms. Archie's tweet of June 19, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

208.  Ms. Archie's tweet of June 19, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle

football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

209.     Ms. Archie's tweet of June 19, 2018 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @kewlhandluke11; and there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was trolling CTE families.

210.     Ms. Archie's tweet of June 19, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

211.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of June 19, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

212.     Ms. Archie's June 19, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

213.     Ms. Archie's tweet of June 19, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter account @kewlhandluke11.

214.     Ms. Archie's tweet of June 19, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT IX</u>

<u>(Libel: Tweet of June 20, 2018)</u>

215.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

216.     Ms. Archie's tweet of June 20, 2018 (Ex. 60) – "Spare us the CTE denier trolling from a phony account" – was defamatory because:

    a.    It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;

    b.    It was made to at least one other individual other than Ms. de Lench;

    c.    It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and

    d.    Ms. de Lench has suffered damages as a result of the tweet.

217.     Ms. Archie's tweet of June 20, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

218.     Ms. Archie's tweet of June 20, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

219.     Ms. Archie's tweet of June 20, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of June 20, 2018 and any legislative, executive, or judicial body or any governmental proceeding, and there is no

objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

220.     Ms. Archie's tweet of June 20, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

221.     Ms. Archie's tweet of June 20, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

222.     Ms. Archie's tweet of June 20, 2018 lacks any objectively reasonable factual support because there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from phony accounts.

223.     Ms. Archie's tweet of June 20, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

224.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of June 20, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

225.     Ms. Archie's June 20, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

226.     Ms. Archie's tweet of June 20, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the phony Twitter account she claims Ms. de Lench was using.

227.     Ms. Archie's tweet of June 20, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT X

### (Libel: Tweet of June 26, 2018)

228.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

229.     Ms. Archie's tweet of June 26, 2018 (Ex. 64) – that "Is this why you troll CTE families, mock them about their dead children – was defamatory because:

a.   It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
b.   It was made to at least one other individual other than Ms. de Lench;
c.   It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
d.   Ms. de Lench has suffered damages as a result of the tweet.

230.     Ms. Archie's tweet of June 26, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

231.     Ms. Archie's tweet of June 26, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

232.     Ms. Archie's tweet of June 26, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of June 26, 2018 and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

233.     Ms. Archie's tweet of June 26, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

234.     Ms. Archie's tweet of June 26, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

235.     Ms. Archie's tweet of June 26, 2018 lacks any objectively reasonable factual support because Ms. de Lench was trolling CTE families about their dead children.

236.     Ms. Archie's tweet of June 26, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

237.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of June 26, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

238. Ms. Archie's June 26, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

239. Ms. Archie's tweet of June 26, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others.

240. Ms. Archie's tweet of June 26, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT XI

### (Libel: Tweet of August 16, 2018)

241. Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

242. Ms. Archie's tweet of August 16, 2018 (Ex. 67) – that "@DanConner76 was Ms. de Lench, and that she was also @kewlhandluke11 – was defamatory because:

a. It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
b. It was made to at least one other individual other than Ms. de Lench;
c. It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
d. Ms. de Lench has suffered damages as a result of the tweet.

243.     Ms. Archie's tweet of August 16, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

244.     Ms. Archie's tweet of August 16, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

245.     Ms. Archie's tweet of August 16, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of August 16, 2018 and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

246.     Ms. Archie's tweet of August 16, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

247.     Ms. Archie's tweet of August 16, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

248.     Ms. Archie's tweet of August 16, 2018 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from multiple phony accounts; or that Ms. de Lench was mocking her son' death.

249.     Ms. Archie's tweet of August 16, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

250.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of August 16, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

251.     Ms. Archie's August 16, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

## COUNT XII

### (Libel: Tweet of August 20, 2018)

252.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

253.     Ms. Archie's tweet of August 20, 2018 (Ex. 104 – asserting that Brooke had more than one troll account and have had so many shut down previous to this one – was defamatory because:

a.     It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
b.     It was made to at least one other individual other than Ms. de Lench;
c.     It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and

    d.  Ms. de Lench has suffered damages as a result of the tweet.

254.  Ms. Archie's tweet of August 20, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

255.  Ms. Archie's tweet of August 20, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

256.  Ms. Archie's tweet of August 20, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of [  ] and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

257.  Ms. Archie's tweet of August 20, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

258.  Ms. Archie's tweet of August 20, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

259.     Ms. Archie's tweet of August 20, 2018 lacks any objectively reasonable factual support because Ms. de Lench had no troll Twitter accounts; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from multiple phony accounts; or that Ms. de Lench had had many Twitter accounts shut down previous to this one."

260.     Ms. Archie's tweet of August 20, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

261.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of August 20, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

262.     Ms. Archie's August 20, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

263.     Ms. Archie's tweet of August 20, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others.

264.     Ms. Archie's tweet of August 20, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

<u>COUNT XIII</u>

(<u>Libel: Tweet of October 21, 2018</u>)

265.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

266.     Ms. Archie's tweet of October 21, 2018 (Ex. 73) – identifying Ms. de Lench as the person hiding behind the @DanConner76 and @kewlhandluke11 Twitter accounts, – was defamatory because:

    a.    It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
    b.    It was made to at least one other individual other than Ms. de Lench;
    c.    It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
    d.    Ms. de Lench has suffered damages as a result of the tweet.

267.     Ms. Archie's tweet of October 21, 2018 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

268.     Ms. Archie's tweet of October 21, 2018 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

269.     Ms. Archie's tweet of October 21, 2018 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of October 21,

2018 and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

270.     Ms. Archie's tweet of October 21, 2018 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

271.     Ms. Archie's tweet of October 21, 2018 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

272.     Ms. Archie's tweet of October 21, 2018 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms. de Lench was tweeting from multiple phony accounts; or that Ms. de Lench was mocking her son' death.

273.     Ms. Archie's tweet of October 21, 2018 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

274.     Ms. de Lench's defamation claim regarding Ms. Archie's tweet of October 21, 2018 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

275.     Ms. Archie's October 21, 2018 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

276.     Ms. Archie's tweet of October 21, 2018 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others.

277.     Ms. Archie's tweet of October 21, 2018 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## COUNT XIV

### (Libel: Tweet of January 28, 2018)

278.     Ms. de Lench incorporates and realleges, as if fully set forth in this paragraph, the allegations of the foregoing paragraphs.

279.     Ms. Archie's direct (private) Twitter message to @TDTommy33 of January 28, 2019 (Ex. 73) – identifying Ms. de Lench as the person hiding behind the @kewlhandluke11 Twitter account, – was defamatory because:

a.     It held Ms. de Lench up to contempt, hatred, scorn, or ridicule and tended to impair Ms. de Lench's standing in the minds of a considerable and respectable class in the youth sports community;
b.     It was made to at least one other individual other than Ms. de Lench;
c.     It did not relate to a matter of public concern, and, if it did relate to a matter of public concern, was both defamatory and false; and
d.     Ms. de Lench has suffered damages as a result of the tweet.

280.     Ms. Archie's tweet of January 28, 2019 concerning Ms. de Lench did not fall with any constitutional or statutory protection of the right to petition the government for redress of grievances.

281.     Ms. Archie's tweet of January 28, 2019 did not constitute a written statement made before or submitted to a legislative, executive, or judicial body or any other governmental proceeding but was made on social media.

282.     Ms. Archie's tweet of January 28, 2019 concerning Ms. de Lench did not constitute a written statement in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other governmental proceeding in that it was not made to influence, inform, or at the very least reach governmental bodies, either directly or indirectly and because there is no plausible nexus between Ms. Archie's tweet of [        ] and any legislative, executive, or judicial body or any governmental proceeding, and there is no objective indicia of an intent by Ms. Archie in posting her tweet to influence a governmental proceeding.

283.     Ms. Archie's tweet of January 28, 2019 is not reasonably likely to encourage consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body.

284.     Ms. Archie's tweet of January 28, 2019 was not reasonably likely to enlist public participation in an effort to effect consideration or review of the issue of banning tackle football before age 14 by any legislative, executive, or judicial body or any other governmental proceeding.

285.     Ms. Archie's tweet of January 28, 2019 lacks any objectively reasonable factual support because Ms. de Lench was not tweeting from the Twitter account, @OkayestOfMoms; there is no objectively reasonable basis for Ms. Archie's assertion that Ms.

de Lench was tweeting from multiple phony accounts; or that Ms. de Lench was mocking her son' death.

286.      Ms. Archie's tweet of January 28, 2019 caused Ms. de Lench actual injury in that the tweet caused her to suffer emotional and reputational harm.

287.      Ms. de Lench's defamation claim regarding Ms. Archie's tweet of January 28, 2019 was not brought primarily to chill any legitimate petitioning activity by Ms. Archie, but rather to seek damages for the personal harm she suffered as a result of Ms. Archie's tweet.

288.      Ms. Archie's January 28, 2019 tweet contained assertions of fact and did constitute imaginative expression or rhetorical hyperbole.

289.      Ms. Archie's tweet of January 28, 2019 states and/or implies knowledge of objectively verifiable information and/or access to information about the ownership of the Twitter accounts she claims to have blocked not available to others.

290.      Ms. Archie's tweet of January 28, 2019 was made with actual malice in that it was made either with Ms. Archie's actual knowledge of its falsity, a high degree of awareness of its probable falsity, or with reckless disregard of its truth or falsity, and was published in furtherance of a campaign by Ms. Archie to defame or otherwise injure Ms. de Lench's reputation as a youth sports expert and cause her emotional distress.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff Brooke de Lench respectfully requests that this Court:

A.     Enter judgment for the plaintiff and award her damages as determined after a trail on the merits;
B.     Award plaintiff costs of suit; and
C.     Grant such other and further relief as this Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT


Respectfully submitted,

BROOKE DE LENCH

By her attorney,

 /s/ Lindsey M. Straus /s/
Lindsey M. Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
110 Court Way
Brewster, MA 02631
(508) 896-8008
lindseystrausoncape@gmail.com

Dated: March 25, 2019


## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2019, I caused the foregoing document to be filed electronically on CM/ECF, thereby causing electronic notice to be provided to all counsel of record and paper copies will be sent to those indicated as nonregistered participants.

 /Lindsey M. Straus
Lindsey M. Straus