UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROOKE DE LENCH,
        Plaintiff

v.

KIMBERLY ARCHIE,
        Defendant.

Civil Action No.: 1:18-cv-12549-LTS

**DEFENDANT KIMBERLY ARCHIE'S REPLY IN SUPPORT OF MOTION TO DISMISS**

**[ORAL ARGUMENT REQUESTED]**

I. **ALL OF THE ALLEGEDLY DEFAMATORY STATEMENTS ARE PART OF THE PUBLIC DEBATE OVER CTE, AND PLAINTIFF IS USING THIS LAWSUIT TO STIFLE MS. ARCHIE'S SPEECH IN ORDER TO ADVANCE HER OWN BUSINESS INTERESTS.**

Plaintiff insists in her Opposition ("Opposition") to Ms. Archie's Motion to Dismiss ("Motion") that the allegedly defamatory statements made by Ms. Archie (the "Statements") are personal to Plaintiff and therefore cannot be aimed at influencing legislators in the debate over football and the causation of, prevention of and incidence of CTE and brain damage ("CTE debate"). Opposition, pp. 12-13.  Plaintiff's argument misses the mark both regarding the scope of the anti-SLAPP statute's protections and regarding the manner in which the Statements pertain to and may influence the CTE debate.

The case law clearly instructs that the anti-SLAPP statute's definitions are to be broadly construed.

> "The anti-SLAPP statute defines a party's exercise of its right to petition broadly to include: "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist

public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government.' G. L. c. 231, § 59H."

*Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141, 147-148 (2017).  Under several prongs of the statutory definition, not limited to but including prongs 2, 4 and 5, it is clear that Ms. Archie's statements about Plaintiff and her conduct are protected by the statute.  Not only have legislation or regulations imposing minimum ages or other restrictions for tackle football recently been considered in places including Maine, Massachusetts, California, Iowa, New Jersey, Illinois and a city in Georgia, *see* Exhibit A to the Affidavit of Kimberly Archie accompanying this Reply ("Reply Aff."), thereby implicating prong 2, it is evident that the most effective, and perhaps only, way to set restrictions on football, for youth or others, would be via governmental or quasi-public agency regulation at the state, local or national level.  Therefore, the public debate about CTE and brain damage and the safety and risks of football necessarily is aimed at enlisting public participation in an effort to promote or oppose governmental or other regulatory action.

At the very least, Ms. Archie's complaints about Plaintiff in the Statements were intended to reach other participants in the CTE debate, as contemplated by the fourth prong of the anti-SLAPP statute.  Plaintiff acknowledges as much when she admits that Ms. Archie's statements were designed to reach "Ms. Archie's Twitter followers."  Opposition, p. 13.  Ms. Archie is a prominent voice in the CTE debate, *see* Affidavit to Motion ("Motion Aff."), ¶ 14; her Twitter followers are participants and advocates – including advocates for legislative and regulatory change – in that debate. Reply Aff. ¶ 2.  Plaintiff, by her own account, is also a prominent voice on sports safety and with very different views from Ms. Archie's in the CTE debate. *See* Reply Aff. Exh. B (MomsTEAM biography describing Plaintiff as a "visionary thought leader in youth

sports safety and pioneer in concussion education"). Ms. Archie's Statements challenging Plaintiff's credibility necessarily pertain to Plaintiff's status as a self-proclaimed sports safety expert and consequently to Plaintiff's ability to advance her views. Even if all the Statements did not relate to the CTE debate, either in their very content or by responding to another CTE-related statement (which, as discussed in Ms. Archie's Memorandum and supporting documents, *see* Memorandum p. 14, and illustrated in Reply Aff. Exh. H, they do), each Statement pertains to the credibility of an advocate in the CTE debate. Ms. Archie's commentary on what she understands to be Plaintiff's online speech and conduct is commentary on Plaintiff as a self-described advocate and subject matter expert. The Statements are not about Plaintiff's general behavior or speech in unrelated spheres; they are not complaints about Plaintiff's tweets on topics such as the presidency or foreign policy nor about her conduct toward gun owners or anti-abortion protestors. They are statements about Plaintiff's conduct in the CTE debate and toward those affected by CTE. As a result, Ms. Archie's Statements are necessarily about Plaintiff's credibility as a sports safety advocate and therefore are inextricably related to Plaintiff's positions and advocacy in the CTE debate.

In addition, because all of the Statements pertain to the CTE debate, they are related to "an issue under consideration or review by a … judicial body" G.L. c. 231, § 59H[2]. As Plaintiff notes in her affidavit at paragraph 16, Ms. Archie is lead plaintiff in a class action lawsuit pending in the United States Central District of California against the Pop Warner Football organization. A central issue in that lawsuit is the relationship between youth tackle football and CTE/brain damage. Reply Aff. ¶ 4. Everything Ms. Archie says or writes related to CTE or those who deny or downplay its causation and incidence is, of course, related to "an issue under consideration" by the Court hearing the *Pop Warner* case.

Furthermore, not only is Plaintiff using this lawsuit to stifle criticism, she is using it to advance her own status in the CTE debate, and to raise funds to support her goals. Plaintiff created a Go Fund Me page to solicit money for what she described as a "legal defense fund." Reply Aff. Exh. C. Not only has she collected money through that effort, her appeal for funds seeks support from those who share the goal of silencing Ms. Archie because they also support youth football. Among those who have donated to her effort are donors who identified themselves as Tom Dompier and William Barr, both expert witnesses for the Pop Warner football organization in the suit over CTE in which Ms. Archie is lead plaintiff, and Joe Ehrman, a former NFL player and advocate of youth tackle football. Reply Aff. ¶ 6. Another donor identified itself as "safety first sports.com," which is the business website of Bryan Pinder, a supporter of tackle football for those under 14. *Id.* Plaintiff, who has stated publicly her interest in "saving" football, *see* Motion Aff. Exh. 5, who has been an advocate for the position that the problem of CTE can be addressed through the use of safety equipment in football, *see* Reply Aff. Exh. D, and who, upon information and belief has accepted money from companies making and selling such equipment, *see id.* Exh. E, is using this litigation to cement her support from those companies and from other proponents of youth football.[1] Furthermore, she is receiving, acknowledging and welcoming support from those who have a stated purpose of "saving" youth football. *See id.* Exh. F. In addition, Plaintiff apparently has added so-called "meta tags" (essentially, computer coding) to her press release announcing this lawsuit which connect it to the name "Kimberly Archie" and acronym "CTE" such that it is a prominent search result when

---

[1] Other donors to Plaintiff's Go Fund Me fundraiser purport to be 1) Christopher Leupold, a professor and football supporter; 2) Lauren Long, a former soccer player and the founder of the "Concussionconnection" account on Twitter, which takes positions opposite Ms. Archie's on the CTE debate; 3) Rosemarie Moser, a supporter of youth tackle football, and 4) Jesse Chasman, a neuropsychologist with ties to the "save football" movement. Reply Aff. ¶ 6.

4

someone enters those terms into a Google search. *Id.*, ¶ 10, Exh. G, top of first page. Plaintiff apparently hopes for multiple benefits from this lawsuit: the silencing of Ms. Archie, a significant critic of Plaintiff and her positions; the damaging of Ms. Archie's reputation and effectiveness as a safety advocate; and a resulting boost in Plaintiff's fund-raising and higher profile for Plaintiff in the youth football world.

**II.     ALL OF THE ALLEGEDLY DEFAMATORY STATEMENTS ARE EITHER OPINION, OR NON-DISPARAGING, OR BOTH.**

In the Opposition, Plaintiff appears to narrow again the group of writings she is now claiming are defamatory. These Statements are those referenced in Counts III-XIV of her Amended Complaint; she asserts, "A review of **the tweets and Facebook posts by Ms. Archie at issue in this case discloses that … [a]ll falsely accuse Ms. De Lench of setting up multiple 'phony,' 'anonymous' or 'fake' Twitter accounts to use in 'defaming', 'harassing' or 'trolling' Ms. Archie or CTE families or 'mocking' her son's death**."[2]  Opposition, p. 2.

Plaintiff's claim regarding <u>all</u> of the allegedly defamatory Statements, then, has two parts: 1) that Plaintiff was accused of "setting up multiple 'phony,' 'anonymous' or 'fake' Twitter accounts" and; 2) that the accounts were used in "'defaming', 'harassing' or 'trolling' Ms. Archie or CTE families or 'mocking' her son's death." *Id*.  For the reasons discussed in the Memorandum, the second part of the claim is a matter of opinion because whether the accounts in question "harassed," "trolled" or "defamed" Ms. Archie or "mocked" her son's death necessarily involves subjective assessments.  However, even if Plaintiff could show that the claim that the accounts "harassed," "trolled" or "defamed" Ms. Archie, and the claim that

---

[2] As illustrated in the chart accompanying this Reply as Reply Aff. Exh. H, Plaintiff apparently no longer contends that Ms. Archie's claims that Plaintiff told a reporter Ms. Archie had lied are defamatory. These statements underlie Counts I and II, now shaded in grey on the chart.  The status of Count X is unclear, as it did not refer to any "fake" or imposter accounts, and was in direct response to an included tweet from Plaintiff in her own name.

5

Plaintiff set up "phony," "anonymous," or "fake" accounts were assertions of fact, the assertions are merely that Plaintiff was responsible for the contents of certain social media accounts which were not in her name, either as an author, or as someone supplying material or language to the author(s). Even if Plaintiff were then able to show through discovery, as she states she hopes to do,[3] that she was not actually behind the social media accounts of which Ms. Archie complained, she would have proved only one element of defamation: falsehood. Plaintiff has not pleaded, and cannot prove, another necessary element of defamation: disparagement.

Plaintiff alleges generally that one of the Statements "directly accused Ms. de Lench of conduct which the average reader would view as unethical, dishonest, cowardly, cruel, morally reprehensible, and/or lacking the empathy one would expect from a woman who had built her reputation over nearly two decades on being a trusted advocate for youth sports parents and sports safety." Opposition, pp. 4-5. However, Plaintiff has acknowledged writings which are substantially the same as those made by the social media accounts with which she complains she was falsely associated. For example, in the tweet in question, Ms. Archie criticized Plaintiff and stated that this was one example of Plaintiff trolling or harassing Ms. Archie, who is outspoken on CTE.[4] However, Plaintiff has acknowledged multiple posts or tweets of her own regarding CTE, often questioning the link between CTE and football, or the seriousness of the CTE risk posed by football, s*ee, e.g.*, Motion Aff. Exhs. 3, 5, 8, and has written at length about the subject. *See e.g.,* Motion Aff. Exh. 2, Reply Aff. Exh. D.[5]

---

[3] Plaintiff's claim that the IP addresses she hopes to obtain from Twitter will positively prove that she is not responsible for certain tweets is spurious. As many Internet users are aware, there are tools, such as so-called Tor servers, that allow users to disguise their IP addresses. Reply Aff. ¶ 12.

[4] Plaintiff contends it was defamatory to accuse her of harassment. However, as recently as January 2019, she publicly made similar statements, endorsing a tweet about this lawsuit which called Ms. Archie a bully. Reply Aff. Exh. F.

[5] Plaintiff wrote: "[W]e know that there are those who are not at all happy that we are taking a pro-active, glass-half-full approach to trying to meeting the challenge concussions and head injuries pose in football. In an effort to discredit the [Plaintiff's documentary] "The Smartest Team," it appears that powerful interests in the multi-million business

In addition to taking positions identical to those advocated by social media accounts with which she claims to have been falsely associated, Plaintiff has admitted disparaging Ms. Archie to other people, in terms which could be characterized fairly as harassing.[6] *See* Am. Com., ¶¶ 32-36. In fact, Plaintiff can be shown to have made comments very similar to all of the tweets and posts addressed in the Statements. The Statement which underlies Plaintiff's Count IV, for example, was in direct response to an anonymous tweet, which Ms. Archie referenced by means of a screenshot, questioning whether Ms. Archie's son's death was really from CTE. Dkt. 23-43. As illustrated previously, *see* Motion Aff. Exhs. 4, 7, Plaintiff repeatedly has broadcast the same intrusive, unwarranted purported questions regarding Ms. Archie's son's death.[7] Furthermore, with respect to other Tweets from specific accounts regarding which Ms. Archie complained, such as @kewlhandluke11, *see* Count XIII, Plaintiff has had interactions of mutual encouragement and support with the accounts or individuals behind them, or they share common allies in the CTE debate as it is conducted online. Reply Aff. Exh. I. Given that each referenced account or user has written about CTE in ways similar to Plaintiff, *see* Reply Aff. ¶ 14, there is no way that it can be considered sufficiently disparaging to be defamatory to have associated

---

that is Concussion, Inc. are working overtime, both in the Twittersphere, through a whisper campaign, and via other even more insidious back-channel means, to cripple our ability to spread the word about our documentary, including trying to convey to the viewing public the impression that MomsTEAM and I are somehow peddling junk science….and that our objectivity has somehow been clouded by alleged conflicts of interest, including asserting that we are merely a cipher or football apologist on the payroll of the National Football League." Reply Aff. Exh. D.

[6] As Ms. Archie noted in her Memorandum, characterizing behavior as "harassing" or "trolling" is facially a statement of opinion. While Plaintiff argues in her Opposition that such characterizations imply undisclosed facts, Ms. Archie repeatedly linked to tweets she believed, and continues to believe, were posted by Plaintiff as part of her complaints about Plaintiff's behavior. *See* Reply Aff. Exh. H. In fact, Counts III, IV, VI, VIII, IX, X, XI, XII, XIII, and XIV are all premised on tweets or posts which were made in direct response to the statements of which Ms. Archie complained or which were accompanied by screenshots of the referenced statements. Therefore, Ms. Archie's underlying facts were fully disclosed, contrary to Plaintiff's assertion that Ms. Archie "fail[ed] to provide readers with evidence of her assertions regarding plaintiff's conduct, as she easily could have done." Opposition, p. 5. Furthermore, by linking to the Tweets or posts, Ms. Archie did essentially what Plaintiff claims she should have done: "simply retweeted it with a comment so that her followers could determine for themselves whether it constituted harassment." *Id.* p. 5, n. 8.

[7] In at least one instance, that underlying Count X, Ms. Archie's Statement was in response to an acknowledged tweet from Plaintiff (to which Ms. Archie linked), not just a tweet similar to those historically made by Plaintiff.

Plaintiff with accounts or online personas who have publicly allied themselves with her or her ideology, or vice versa, without objection by Plaintiff.

To the extent that Plaintiff may be arguing that it was defamatory for Ms. Archie simply to claim that Plaintiff used fake names on the Internet (to issue tweets which are substantially the same as her acknowledged tweets), such a claim is insufficiently disparaging. One might have any number of motives for using aliases on the Internet, and it cannot be considered damaging to reputation merely to note that someone engages in this common practice. *Cf. Ellis v. Safety Ins. Co.,* 41 Mass. App. Ct. 630, 637 (1996) (it was potentially defamatory to call someone "phony and [state the person] submitted a fraudulent claim" because the statement accused the person of the crime of insurance fraud, not because it applied the label "phony"). Furthermore, in addition to tweeting under her own name and Twitter handle (@brookedelench), Plaintiff admittedly tweets as @Momsteam, @SmartTeams and @TheSmartestTeam. Am. Com. ¶ 29. It is difficult to imagine how it could be considered disparaging to state that Plaintiff tweets under names other than her legal name, particularly when she acknowledges such a practice.

III. **PLAINTIFF HAS ACKNOWLEDGED SHE IS AT MINIMUM A LIMITED PURPOSE PUBLIC FIGURE AND CANNOT DEMONSTRATE THE ACTUAL MALICE THAT HER STATUS REQUIRES.**

As Plaintiff admits by emphasizing her own prominence in the sports safety field, Plaintiff is at minimum a limited purpose public figure with respect to the CTE debate. *See* Memorandum pp. 18-19, s*ee also* Opposition, p. 9 ("To dismiss plaintiff's case now…would be to apply a standard that few if any public figures claiming defamation could meet…"). Since Plaintiff is at minimum a limited purpose public figure, she must meet the actual malice standard to prove defamation.

Plaintiff's argument that Ms. Archie held a "deep animosity toward plaintiff" and that this somehow eliminates "[a]ny doubt," Opposition, p. 6, about Ms. Archie's alleged actual malice misses the mark. Actual malice does not refer to dislike or other emotional states. It refers to a declarant's knowledge and intent. "The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (internal quotation omitted). Actual malice requires knowledge or reckless disregard of falsity (not merely proof that the assertion is untrue) which Plaintiff has not shown and cannot show because Ms. Archie had a reasonable belief that the Statements were made by Plaintiff, both because they contained a unique punctuation error which Ms. Archie recognized from Plaintiff's acknowledged statements, and because they were substantially the same in content as many of Plaintiff's known statements. Reply Aff. ¶ 15. Furthermore, to prevail, Plaintiff "must prove actual malice with 'convincing clarity.'" *Mandel v. Bos. Phoenix, Inc.,* 456 F.3d 198, 201 (1st Cir. 2006). Plaintiff will not be able to do so, given that style and content similarities between the tweets and posts referenced in the Statements and Plaintiff's acknowledged tweets and posts support Ms. Archie's reasonable belief that Plaintiff is the moving force behind the tweets and posts. *See Ortiz v. Department of Health and Human Svcs.,* 874 F.Supp. 570, 574 (S.D.N.Y. 1995) (noting that "the grammar, syntax, and language usage in the letter could identify the author by his or her writing style"). While "[o]n a Rule 12(b)(6) motion to dismiss, we do not concern ourselves with questions of evidentiary sufficiency, …. [but rather ask] only whether [plaintiff] 'la[id] out enough facts from which malice might reasonably be inferred,'" *Lemelson v. Bloomberg L.P.,* 903 F.3d 19, 24 (1st Cir. 2018), Plaintiff has not made such a showing, and cannot do so. Given her mere assertion that Ms. Archie does not like her and therefore must have acted with actual malice, Plaintiff fails to

" 'nudge[]' [her] actual malice claim 'across the line from conceivable to plausible,'" *id.* (internal citations omitted), as required.

For the foregoing reasons, and the reasons set forth in the Memorandum accompanying her Motion to Dismiss, Defendant respectfully requests that the Amended Complaint be dismissed.

### REQUEST FOR ORAL ARGUMENT

Defendant respectfully requests oral argument on this motion and is joined by Plaintiff in this request.

Dated: May 10, 2019

> The Defendant,
> KIMBERLY ARCHIE,
> By Her Attorneys:
>
> */s/ Francis D. Dibble*
> Francis D. Dibble, BBO No. 123220
> Elizabeth S. Zuckerman, BBO No. 673190
> Bulkley, Richardson and Gelinas, LLP
> 1500 Main Street, Suite 2700
> Springfield, MA 01115
> Tel. (413) 272-6219
> Fax (413) 272-6804
> fdibble@bulkley.com
> ezuckerman@bulkley.com

### CERTIFICATE OF SERVICE

I, Francis D. Dibble, hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on May 10, 2019.

> */s/ Francis D. Dibble*
> Francis D. Dibble