UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BROOKE DE LENCH, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 18-12549-LTS |
| KIMBERLY ARCHIE, | ) ) ) | |
| Defendant. | ) ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 25)

August 8, 2019

SOROKIN, J.

Plaintiff Brooke de Lench's claims in this case, according to her complaint, arise out of a Twitter war waged against her by defendant Kimberly Archie.[1] Both plaintiff and defendant are active in public discourse on chronic traumatic encephalopathy ("CTE"), a neurological disease linked to head impacts, and were acquainted before the events giving rise to this case. Doc. No. 23 ¶¶ 13, 15, 31.

On July 11, 2014, de Lench sent an email to a mutual friend of both women in which she wrote "that she was 'troubled by Kimberly and her attempts to take simple tweets off topic and into her own direction, but as many privately pointed out to me last night, she is brain damaged as are many other confused tweeters.'" Doc. No. 23 ¶ 32. The mutual friend replied that she could not "believe someone said such a mean spirited . . . thing about Kimberly," who is open

---

[1] The Court draws the facts from the amended complaint, Doc. No. 23, and "accept[s] all well-pleaded facts alleged in the Complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The Court recites only as much of the complaint's factual allegations as necessary.

about the traumatic brain injury she suffered as a result of a childhood car accident. Id. ¶¶ 16, 33. After another back-and-forth, de Lench wrote to the mutual friend, "You are good to be her friend. Sorry to have passed on our conversation. In our world of research and writing we tend to talk facts." Id. ¶ 36. The mutual friend then shared the entire exchange with Archie. Id. ¶ 37.

On September 1, 2014, Archie's son died in a motorcycle accident. Id. ¶ 38. Archie has alleged in another pending lawsuit that an autopsy determined that her son was "suffering at the time of his death from so-called 'Stage 1' CTE." Id. ¶ 39. On September 4, 2014, De Lench emailed Archie to "express[] condolences on the loss of her son." Id. ¶¶ 38, 44. Archie responded in an email "in which she viewed Ms. de Lench's email as intended to hurt and exploit her as a grieving mother." Id. ¶ 45. In reply, De Lench wrote "that her words of condolence were sincere, and that she meant no harm to Ms. Archie." Id. ¶ 46. Thereafter, beginning in November 2015 and continuing through January 2019, Archie made a series of postings on social media that de Lench alleges were defamatory to her.

De Lench's sprawling amended complaint, Doc. No. 23, brings fourteen counts of libel based on those postings. Archie now moves to dismiss de Lench's amended complaint, arguing that it fails to state a claim upon which relief can be granted and that Massachusetts' strategic litigation against public participation ("anti-SLAPP") statute, Mass. Gen. L. c. 231, § 59H, mandates early dismissal of de Lench's claims. Doc. No. 25.

As an initial matter, the Court acknowledges that "a federal court sitting in diversity jurisdiction applies the state's substantive law and the federal procedural rules." Godin v. Schencks, 629 F.3d 79, 85 (1st Cir. 2010). In Godin, the First Circuit concluded that Maine's anti-SLAPP statute is substantive and therefore applies in federal court. See id. at 88. Judge Casper thereafter held that Massachusetts's anti-SLAPP statute also applies in federal court

because it is "in all relevant respects the same as the Maine anti-SLAPP statute." Steinmetz v. Coyle & Caron, Inc., Civ. No. 15-13594-DJC, 2016 WL 4074135, at *3 (D. Mass. July 29, 2016). De Lench's opposition to the motion to dismiss does not dispute the application of Massachusetts's anti-SLAPP statute. See generally Doc. No. 30. When a defendant advances motions to dismiss based both on the anti-SLAPP statute and on other grounds, courts "first should decide . . . whether to grant" the anti-SLAPP motion before deciding other grounds for dismissal. Kobrin v. Gastfriend, 821 N.E.2d 60, 70 (Mass. 2005). Because the Court agrees with Judge Casper's thoughtful opinion, it first proceeds to analyze the complaint under the anti-SLAPP statute.

The anti-SLAPP statute, which is intended to protect the constitutional right to petition from the burden of meritless lawsuits, provides for a special motion to dismiss so that courts can "dispose expeditiously of meritless lawsuits that may chill petitioning activity." See Town of Hanover v. New England Reg'l Council of Carpenters, 6 N.E.3d 522, 528 (Mass. 2014). The review of such a motion relies on a burden-shifting test: Once the defendant "make[s] a threshold showing through the pleadings and affidavits that the claims against it are based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities," Duracraft Corp. v. Holmes Prod. Corp., 691 N.E.2d 935, 943 (Mass. 1998), "the burden shifts to [plaintiff] to demonstrate by a preponderance of the evidence that [defendant's] petitioning activity was devoid of any reasonable factual support or any arguable basis in law." Fabre v. Walton, 766 N.E.2d 474, 480 (Mass. 2002).

> The anti-SLAPP statute defines a party's exercise of its right to petition broadly to include: "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue

> by a legislative executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government."

Blanchard v. Steward Carney Hosp., Inc., 75 N.E.3d 21, 29 (Mass. 2017) (quoting Mass. Gen. Laws ch. 231, § 59H). With the anti-SLAPP statute, "the Legislature intended to enact very broad protection for petitioning activities." Duracraft, 691 N.E.2d at 940.

None of Archie's statements at issue in this case "are based on . . . petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." Duracraft, 691 N.E.2d at 943. All of the statements are personal in nature, directly addressing de Lench's supposed conduct. See Doc. No. 27-9 (collecting the statements). While Archie's public interactions on social media may often address issues of public concern regarding youth sports safety and CTE, none of the statements now at issue contain any material that has such general relevance. Indeed, many of the statements do not even refer to CTE or youth sports safety directly, referring only to de Lench. To read the statements as petitioning activity on those issues is therefore essentially to interpret any reference to de Lench in any context whatsoever as petitioning activity on youth sports safety.

Given that the statements at issue were made on social media, they clearly were not "made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding," Mass. Gen. Laws ch. 231, § 59H, and Archie advances no suggestion that any were made in connection with such a proceeding. No statement at issue is "reasonably likely to encourage consideration or review of an issue by a legislative executive, or judicial body or any other governmental proceeding" or "to enlist public participation in an effort to effect such consideration." Id. All of the challenged statements lack the requisite "plausible

nexus between the statement and [a] governmental proceeding." Blanchard, 75 N.E.3d at 30. Accordingly, none of de Lench's claims are dismissed under the anti-SLAPP statute.

Archie advances three alternative grounds for dismissal of de Lench's libel claims. She first argues that that the supposedly libelous statements at issue in Counts III, IV, V, VI, VIII, IX, X, XI, and XII[2] are protected opinion that is not capable of being defamatory. Doc. No. 26 at 4–9. The Supreme Court has "held that only statements that present or imply the existence of facts that can be proven true or false are actionable under state defamation law." Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000). "But to say 'I think' is not enough to turn fact into opinion, where what is supposedly 'thought' is, or implies, a proposition of fact." Id. (citations and internal quotations omitted). Rather, statements are protected when they "involve[] expressions of personal judgment, especially as the judgments become more vague and subjective in character." Id.

The statements at issue in Counts III, IV, V, VI, VIII, IX, X, XI, and XII all present or imply essentially the same statement of fact: that de Lench used multiple Twitter accounts, in violation of Twitter's policies and despite Twitter's attempts to stop this behavior, to hide her persistent harassment of Archie. See Doc. Nos. 23-42, 23-43, 23-45, 23-47, 23-53, 23-54, 23-56, 23-63. Whether de Lench in fact used multiple Twitter accounts is plainly capable of being true or false, as is whether Twitter took action to block those accounts or hinder de Lench's use of the social media platform through other means. These specific facts, which together suggest that de Lench used Twitter accounts that concealed her real name to communicate a message about Archie and then continued to do so despite Twitter's attempts to block her, "could damage [de

---

[2] Archie presents the statements relevant to each count of de Lench's complaint at Doc. No. 27-9 along with a summary of the bases upon which she argues for each count's dismissal. De Lench does not dispute the accuracy of this helpful table.

Lench's] reputation in the community" and are therefore capable of being defamatory. Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510 (Mass. 2003). The defamation does not depend on Archie's characterization of the message de Lench supposedly disseminated as trolling or harassment. Rather, the means that the statements allege de Lench used to express the message is itself capable of being defamatory.[3]

Although the statement at issue in Count X, that de Lench "troll[ed] CTE families" and "mock[ed] them about their dead children," Doc. No. 23-58, lacks reference to de Lench's supposed use of multiple Twitter accounts, even that tweet "presents or implies the existence of facts which are capable of being proven true or false," Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997)—namely, that de Lench communicated in a trolling or mocking manner with multiple families who lost children to CTE. Accordingly, all of the statements Archie challenges as mere opinion contain facts sufficient to state a claim for defamation.

Archie next argues that her statements are protected by the common-law self-defense privilege. Doc. No. 26 at 16–18. "One attacked by a slander or libel has a right to defend himself, but he has no right to turn his defense into a slanderous or libelous attack, unless it clearly appears that such attack was necessary for his justification." Conroy v. Fall River Herald News Co., 28 N.E.2d 729, 730 (Mass. 1940). As alleged in de Lench's complaint, Archie's statements

---

[3] Archie's tweets at issue in Count XI state only that de Lench used two Twitter accounts. See Doc. No. 23-61. Given that there exist obviously legitimate reasons to use more than one Twitter account, these statements do not, on their own, include facially defamatory material. However, the meaning of a potentially defamatory statement must be "[v]iewed in context." Sindi v. El-Moslimany, 896 F.3d 1, 17 (1st Cir. 2018). In the context of the Twitter exchange in which the tweets were made, see Doc. No. 23-61, the tweets clearly imply that de Lench used multiple Twitter accounts that concealed her real name to communicate a message about CTE and are therefore capable of being defamatory.

went well beyond responding only to de Lench's 2014 comments about Archie's son, made in private to one other person. As alleged, Archie's statements occurred over a period of more than two years and were significantly more public than de Lench's statement. Archie cites no authority for the proposition that the common-law self-defense privilege covers such broad statements without any factual inquiry. Accordingly, on the record currently before the Court, the privilege does not suffice to require dismissal.

Finally, Archie argues that de Lench has failed to allege the actual malice required to make out a claim of defamation of a limited public purpose figure such as de Lench. Doc. No. 26 at 18–20. De Lench conceded at the hearing on this motion that she is a limited public purpose figure for the purpose of public debate about youth sports safety and CTE. To demonstrate actual malice is to show "proof that the speaker published the statement with knowledge of its falsity or with reckless disregard as to whether it was false." Pendleton v. City of Haverhill, 156 F.3d 57, 65 (1st Cir. 1998). "Because direct evidence of actual malice is rare, it may be proved through inference and circumstantial evidence." Levesque v. Doocy, 560 F.3d 82, 90 (1st Cir. 2009) (citations and internal quotations omitted). A complaint that simply recites "actual-malice buzzwords" is insufficient to overcome a motion to dismiss because "these are merely legal conclusions, which must be backed by well-pled facts." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 56 (1st Cir. 2012).

Here, de Lench has clearly alleged specific facts that present enough evidence, both direct and circumstantial, to create a plausible inference that Archie acted with the requisite actual malice. The alleged defamatory statements take a definite position that de Lench was using multiple Twitter accounts but offer no means by which Archie could have known with such certainty that de Lench wrote the tweets. Archie continued making the alleged statements

despite de Lench's informing her that she was not behind the accounts. See Doc. No. 23-35. Further, the complaint is replete with allegations of statements by Archie that cast de Lench in a negative light, including both the allegedly defamatory statements and others. See, e.g., Doc. No. 23 ¶ 49. These statements give rise to an inference that Archie was motivated, not by the truth, but by her personal feelings about de Lench. Accordingly, the complaint and attached exhibits in their totality plausibly allege the requisite actual malice.[4]

For the foregoing reasons, the motion to dismiss, Doc. No. 25, is DENIED. The Court reminds the parties that it has done no more than find that de Lench has plausibly alleged facts sufficient to state her claim. The Clerk shall schedule a Rule 16 scheduling conference.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[4] The Court notes that "the substantive evidentiary standard of proof for actual malice applies at the motion for summary judgment stage," when de Lench "must provide evidence of actual malice with convincing clarity to survive" a motion for summary judgment. Levesque, 560 F.3d at 87 (citations and internal quotations omitted). The Court's ruling on actual malice for the purpose of the motion to dismiss does not relieve de Lench of this burden at summary judgment.