UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROOKE DE LENCH,
    Plaintiff/Counterclaim Defendant

v.

KIMBERLY ARCHIE,
    Defendant/Counterclaim Plaintiff.

Civil Action No.: 1:18-cv-12549-LTS

**[ORAL ARGUMENT REQUESTED]**

## OPPOSITION OF DEFENDANT/COUNTERCLAIM-PLAINTIFF KIMBERLY ARCHIE TO PLAINTIFF/COUNTERCLAIM-DEFENDANT'S MOTION TO DISMISS

Defendant/Counterclaim-Plaintiff Kimberly Archie ("Ms. Archie") hereby opposes Plaintiff/Counterclaim Defendant Brooke de Lench's ("Ms. de Lench") motion to dismiss the claims ("Motion") Ms. Archie has asserted against her. Ms. de Lench initiated this lawsuit and brought largely conclusory claims against Ms. Archie. Having had those claims survive a motion to dismiss (with the Court's caveat that she had merely alleged facts to clear the low bar to permit discovery to begin), she now does an about-face to assert that her defamatory speech about Ms. Archie is no more than "statements of pure opinion and rhetorical hyperbole protected by the First Amendment." Plaintiff/Counterclaim Defendant's Memorandum in Support of Motion to Dismiss (Dkt. 52)("Memorandum"), p. 8. Ms. de Lench's arguments are inconsistent with her prior insistence that vague, conclusory allegations of defamation and damages are all that is required of a plaintiff, and that the pure opinion doctrine does not protect Ms. Archie's claims that Ms. de Lench bullied and harassed her. *See generally*, pp. 3-5, Plaintiff's Opposition to Defendant's Motion to Dismiss (Dkt. 30).

Furthermore, as set forth in greater detail below, the documents Ms. de Lench produces in support of her arguments against the defamation and intentional infliction of emotional distress counts merely serve to illustrate her culpability. In short, Ms. de Lench initiated and for years pursued attacks on Ms. Archie's character, intellect and judgment, in which Ms. de Lench crossed lines into the defamatory and the extreme and outrageous. Ms. Archie responded by publicly calling out Ms. de Lench, and labeling her harassment of grieving parents, including Ms. Archie, as what it was. Ms. de Lench brought suit against Ms. Archie for Ms. Archie's responses to Ms. de Lench's offensive conduct, and she then used the process she had filed to raise money for her campaign against Ms. Archie and to further advance her own profile and disparage Ms. Archie in her professional and advocacy work and otherwise. Ms. de Lench's litigation conduct is cynical, at best, and her conduct subsequent to the filing of this action affirms her intent to use the court process to harass Ms. Archie, harm Ms. Archie's interests, and promote herself. For these reasons, set forth more fully below, and by the logic set forth in Ms. de Lench's own prior arguments against Ms. Archie's motion to dismiss, Ms. Archie's counterclaims must survive at this stage of the litigation.

I. **MS. ARCHIE HAS ALLEGED DEFAMATION IN MORE THAN SUFFICIENT DETAIL, AND HAS SET FORTH FALSE ALLEGATIONS OF FACT MADE REGARDING HER.**

Ms. Archie has pleaded that, among other things, Ms. de Lench defamed her by falsely labeling her a liar and a bully and has provided specific examples of such defamation in that Ms. de Lench accused her of lying to a reporter and more generally to the public about her son's medical condition, implied she or her ex-husband caused her son's CTE by physically abusing him, and publicly accused her of leading an organized "cabal" with its purpose being the illegal defamation of Ms. de Lench. Counterclaims (Dkt. 47) ¶¶ 77-78. Ms. Archie has properly

pleaded that Ms. de Lench's statements are 1) false, 2) disparaging, and 3) damaging to Ms. Archie's reputation, as well as harmful to her emotionally and in her professional life.

Ms. de Lench attempts to reduce her defamatory statements about Ms. Archie to five. Accepting, for the purposes of opposing the Motion, this categorization of the defamatory statements, Ms. Archie addresses these five categories or collections of statements, and why Ms. de Lench's attempts to discount their defamatory content are unavailing. First, Ms. de Lench addresses her statement that Ms. Archie is "brain damaged" and this "brain damage[]" allegedly is the reason that she is a "confused tweeter" who makes supposedly erroneous statements and goes "off topic." Ms. de Lench asserts that this is mere opinion. Memorandum, p. 5. The argument is both wrong and surprising in light of Ms. de Lench's prior arguments about statements calling her a "troll," "bully," or being guilty of "harassing" conduct, claiming those are false, factual assertions. Apparently, Ms. de Lench believes such disparaging comments are defamatory assertions of fact when said about her, but when she makes disparaging allegations about Ms. Archie, which impugn her based upon her medical history and which imply very specific facts, calling Ms. Archie "brain-damaged" and stating this is the cause of Ms. Archie being "confused" in her beliefs, Ms. de Lench asserts this is simply opinion.

In her statement about Ms. Archie, Ms. de Lench asserted the false allegation of fact that Ms. Archie was "brain-damaged" and then used that factual assertion to discount Ms. Archie's opinions and positions, in the process making a second false, factual allegation – that Ms. Archie's purported "brain damage[]" is the cause of her being "confused" and going "off topic." Exhibit to Amended Complaint (Dkt. 23-5). These assertions, among other things, render erroneous Ms. de Lench's claim that the "pure opinion" doctrine protects her speech.[1] Indeed,

---

[1] The pure opinion doctrine is discussed further, *infra*. While Ms. de Lench attempts to invoke it here, it is apparent why it is misplaced in this instance. Pure opinion expresses one's view only, and implies no facts. Here, Ms. de

3

while Ms. de Lench attempts to claim that she was merely expressing the opinion that she was "troubled" by Ms. Archie's purported pursuit of tangents, *see* Memorandum, p. 5, Ms. de Lench acknowledges that elsewhere in her statement, she made a factual assertion regarding Ms. Archie's "brain damage[]" by further arguing that the assertion is excused because "by her own admission, Ms. Archie has a history of traumatic brain injury … so that referencing that fact, and expressing the opinion that it could possibly account for Ms. Archie taking tweets off-topic, cannot be viewed as either false or having a defamatory meaning by tending to lower Ms. Archie's reputation in the community or deterring third persons from associating or dealing with her." *Id*.  This assertion is wrong-headed as well as offensive.  A person's acknowledged history of a brain injury is a different matter than being currently "brain-damaged" and therefore "confused" and unworthy of belief.  *See Bratt v. Int'l Bus. Machines Corp.,* 392 Mass. 508, 517 (1984) (agreeing that "imputation of mental disorder which is made in an oblique or hyperbolic manner" is not defamatory due to context but "publication to an employer that an employee has a specified mental disorder [which] … make[s] him unfit for his job" is facially defamatory).  Essentially, what Ms. de Lench has done with her statement is take a fact about Ms. Archie's medical history and distort it into a false allegation about Ms. Archie, which she then used as reason to discredit and malign her.  Furthermore, even if a history of traumatic brain injury were the same as "brain damage[]" causing "confus[ion]," Ms. de Lench would be arguing truth as a defense to her own defamation, which cannot be established at this stage.

---

Lench stated that Ms. Archie was "brain-damaged," which would be a fact, not an opinion, and that this was responsible for her being "confused," which is also a factual allegation of the causation of Ms. Archie's alleged confusion.  She did not merely opine, as she claims, "that she was 'troubled' by Ms. Archie's attempts to take simple tweets off topic."  Memorandum, p. 5.  Her further attempt to minimize her culpability by stating she merely relayed that "others had attributed [Ms. Archie taking tweets off topic] to her "brain damage[]" is yet another ineffective attempt to avoid responsibility for a statement she made.

The second statement Ms. de Lench identifies is her email message to Newsweek reporter Teddy Cutler. In that email message, she stated that Ms. Archie's report of the diagnosis of CTE given posthumously to Ms. Archie's son was "highly questionable." The email message reveals that Ms. de Lench, unsolicited, took it upon herself to contact a news reporter and assert that Ms. Archie's report regarding her son's diagnosis was false or erroneous. She also asserted in the email that other possible causes of the pathological findings in Ms. Archie's son's brain were "shaken baby syndrome, rodeo participation, steroid abuse, abrupt braking on a motorcycle, roller coaster riding, school yard fights, physical abuse…." Memorandum, Exhibit A (Dkt. 51-3). In other words, she disputed and labeled false Ms. Archie's statements that her son suffered brain injury from football. In so doing, Ms. de Lench accused Ms. Archie of lying regarding her son's injuries, health, and the reasons for his death. Ms. de Lench attempts to excuse the email message as "simply ask[ing] Mr. Cutler to fact-check Ms. Archie's claim that her son had early Stage 1 CTE by speaking with the pathologist who purportedly examined Paul Bright, Jr.'s brain," Memorandum, p. 7, when in fact she contacted the reporter, unsolicited, to accuse Ms. Archie of specific falsehood and suggest that Ms. Archie might have caused her son's brain injuries and when, as discussed below, she was engaging in this defamation to advance herself in her business activities and damage Ms. Archie in her own such activities.

In the same email, Ms. de Lench also, gratuitously, attacked the claim that Ms. Archie was a "prominent" campaigner in the fight against repetitive head injuries, calling her the "best self-promoter" and stating, bizarrely, that Ms. Archie has acknowledged on occasions being "the only female sitting at a bar." Memorandum, Exhibit A (Dkt. 51-3). Ms. de Lench further accused Ms. Archie of a "self-promotion campaign to draw media attention to herself, her son's

5

questionable CTE diagnosis."[2] It is worthy of note that all of the comments Ms. de Lench made in the email were unsolicited, and in response to nothing more than an article about Ms. Archie's advocacy work and her son's death, which made no reference to Ms. de Lench. Ms. de Lench's attempt to excuse the email message as "simply ask[ing] Mr. Cutler to fact-check Ms. Archie's claim that her son had early Stage 1 CTE by speaking with the pathologist who purportedly examined Paul Bright, Jr.'s brain" is belied by the context of the communication, which was an unprecipitated, no-holds-barred attack on Ms. Archie's credibility in response to an article which discussed Ms. Archie and did not refer to Ms. de Lench or her organization. Ms. de Lench's defamatory email to Mr. Cutler was an unprovoked, malicious attempt to hurt Ms. Archie personally and damage her advocacy work. This evidence, therefore, if found credible by a jury, would support a verdict against Ms. de Lench.

The third statement Ms. de Lench identifies, an August 13, 2016, tweet commenting on an article about Ms. Archie and her son, was, by both its contents and context, directed at Ms. Archie. Ms. de Lench wrote that considering potential causes of CTE like "shaken baby" syndrome and asking "tough questions re football=CTE" were important "especially for [Ms. Archie's son's case]." Counterclaims (Dkt. 47) ¶ 65. Ms. de Lench argues that these statements "cannot be twisted into asserting *as fact* that Ms. Archie actually shook her son when he was a baby, much less that Paul Bright, Jr.'s CTE was caused by such alleged shaking."

---

[2] To the extent that Ms. de Lench might argue these statements were opinion, which she has yet to argue as to this communication, the argument would fail due to the presence of implied but undisclosed facts, a doctrine discussed *infra*. In sum, the communication to the Newsweek reporter is defamatory not only because Ms. de Lench asserts that Ms. Archie has lied about her son's diagnosis, but also because she implies knowledge of specific facts to back up her claim that Ms. Archie's claims about her son, his diagnosis and the cause of his medical condition are "highly questionable." There is no reasonable interpretation of the "highly questionable" other than it implying knowledge of a basis upon which something should be questioned. Furthermore, Ms. de Lench stated that the reporter should "Note the absence of Mr. Bright [Ms. Archie's son] on the "Impacted High School" lives wall: http://concussionfoundation.org/impacted-lives/legacy-donors," Memorandum, Exhibit A (Dkt. 51-3), thus implying knowledge of some undisclosed fact which undermined Ms. Archie's claims.

Memorandum, p. 7.  This argument is specious.  Ms. de Lench's statement that examining the true causes of CTE, which may include physical abuse by a parent, is "especially" important in Paul Bright, Jr.'s case is a classic example of a statement which implies undisclosed facts, and is defamatory as a result.  While expressions of pure opinion are protected, "[l]iability for libel may attach … when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).  Citing a central treatise, the Supreme Judicial Court has stated,

> "'[A]n expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently [than a pure opinion].' Thus if I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic."

*Nat'l Ass'n of Gov't Emp., Inc. v. Cent. Broad. Corp.*, 379 Mass. 220, 227–28 (1979).  Statements found to be defamatory by virtue of implying undisclosed facts include the impugning of ideological opponents as "paid liars," because the statement implied that the speaker had knowledge the individuals were paid to lie, whereas had they been called merely "liars," this would have been opinion.  *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121-122 (2d Cir. 1977).  Ms. de Lench's claim that Ms. Archie's statement that her son suffered from CTE due to football should be particularly subject to scrutiny – scrutiny required "especially for this case" – implied that there was some reason, like "shaken baby" syndrome, of which Ms. de Lench was purportedly aware, that Ms. Archie's statements about her son's diagnosis were especially suspect.  Ms. de Lench's words imply she has some articulable factual basis for the belief that Ms. Archie is misrepresenting her son's medical issues, but whatever that basis may

be is undisclosed. As a result, the statement is defamatory and not protected as pure opinion, because it implies knowledge of underlying facts, including that Ms. Archie is lying about her son.

It is particularly striking that Ms. de Lench asserts that the pure opinion doctrine protects the January 28, 2019, tweet in which she endorsed the labeling of Ms. Archie as a "bully" as well as her statements in press releases concerning this litigation and in fund-raising for this litigation that Ms. Archie is using a "cabal" to harm her "by any means." Ms. de Lench argues these statements were "pure, non-actionable opinion" and cites a Western District of Missouri case for the proposition that "calling a company a 'trademark bully'" is opinion, as well as another for the proposition that calling something "fake" or "phony" is "unproveable." Memorandum, p. 8. In sharp contrast, in her opposition to Ms. Archie's motion to dismiss the many defamation counts asserted against her, Ms. de Lench argued that Ms. Archie falsely accused her of "'defaming', 'harassing' or 'trolling' Ms. Archie or CTE families," Opposition to Ms. Archie's Motion to Dismiss (Dkt. 30) p. 2, and that such claims were "directly and definitely factual," rather than opinion, because "nothing from the context in which it arose, or its format, tone or content, supports the conclusion that it was subjective statement of opinion about Ms. de Lench's character or online behavior." *Id.*, p. 4. In other words, when Ms. de Lench's online conduct was characterized as harassing or bullying, she considered this a defamatory factual assertion, but when she characterized Ms. Archie's online conduct as internet bullying and asserted the existence of a conspiracy to harm her "by any means," making the specific factual allegation that Ms. Archie has a "cabal" of people apparently recruited into service of her nefarious ends, Ms. de Lench claims that was merely an expression of opinion.[3] The contradiction in Ms. de Lench's

---

[3] Ms. de Lench has continued to make the defamatory allegation that Ms. Archie is harassing and bullying her, even since the filing of the counterclaims she now seeks to dismiss. Ms. de Lench encouraged others in a Tweet on

positions here is unavoidable. Contrary to Ms. de Lench's arguments, Ms. Archie has articulated multiple false, factual assertions by Ms. de Lench, not protected as opinion, and so Ms. Archie's defamation claims must be permitted to proceed.

    **II.    MS. DE LENCH'S MALICIOUS, BIZARRE CONDUCT, AS PLEADED, CLEARLY RISES TO THE LEVEL OF EXTREME AND OUTRAGEOUS, FOR REASONS INCLUDING THAT SHE DELIBERATELY AND WITHOUT PROVOCATION TARGETED MS. ARCHIE'S KNOWN VULNERABILITY, GRIEF OVER THE LOSS OF HER CHILD, AND ATTACKED MS. ARCHIE REPEATEDLY, OVER THE COURSE OF YEARS.**

As pleaded by Ms. Archie, and as Ms. de Lench affirms with the email she appends to her Motion, Ms. de Lench's impugning of Ms. Archie to journalists and others has not been responsive to any comments by Ms. Archie directed at Ms. de Lench. Her statements about Ms. Archie to third parties are notable both for their vitriol and for the fact that they were entirely unprovoked. In the case of the statements to Teddy Cutler, Ms. de Lench, apparently upon simply reading an article which remarked upon Ms. Archie, her son and her advocacy work, took it upon herself to contact the journalist and offer her own scathing criticism of what she apparently considered too favorable a portrayal of Ms. Archie and her views. Memorandum, Exhibit A (Dkt. 51-3). In so doing, she purported to reveal that Ms. Archie is allegedly lying about her son's diagnosis and death, lacks professional expertise and is prominent in her field only due to being a "self-promoter." *Id.* She further purports to disclose that Ms. Archie has on occasion been the only woman in a bar full of men (whatever moral decay this apparently implies).[4] What Ms. de Lench's correspondence with Mr. Cutler does not reveal is <u>why</u> Ms. de

---

October 26, 2019 to take legal action against anyone "harass[ing], defam[ing] and …ma[king] [them] the foil" as she had in taking "legal action…. against a cyber-bully." Exhibit A to Affidavit of Kimberly Archie in Support of Opposition to Plaintiff/Counterclaim Defendant's Motion to Dismiss.

[4] Ms. de Lench certainly intends to imply, without any foundation, some slatternly connotation to Ms. Archie's presence as the sole female in a bar with men, rather than that Ms. Archie was making an observation about the imbalanced gender representation at a professional event.

9

Lench believed she was entitled to falsely impugn Ms. Archie to a national news reporter when his published story was about Ms. Archie and the loss of her son, and did not mention or otherwise implicate Ms. de Lench or her organization in any way. The answer appears to be that this contact was a part of Ms. de Lench's years-long campaign of attacks upon Ms. Archie's reputation and character.

While Ms. Archie likely does not know the full extent of Ms. de Lench's widespread efforts to defame and discredit her, she is aware that as early as July 2014, Ms. de Lench was reaching out, wholly without apparent reason, to associates of Ms. Archie to discredit her and impugn her views and mental capacity on the basis of her health status as a person having suffered a brain injury. *See* Exhibit to Amended Complaint (Dkt. 23-5). A notable feature of Ms. de Lench's email to Sharon Van Kooten insulting Ms. Archie was the fact that it was in response merely to Ms. Archie making a statement on Twitter which in no way referred to Ms. de Lench. *Id.* In this instance, Ms. de Lench took it upon herself to challenge Ms. Archie citing to a quotation from Black's Law Dictionary. Apparently, Ms. de Lench was dismayed that another person had retweeted, thereby endorsing, Ms. Archie's statement and wanted her own statements more broadly circulated instead. She wrote,

> "Hi – Saw you tweeted Kimberly Archie's tweet re Black's law dictionary –it has many times not stood up in a court of law as fact (simply a publication) but please tweet this out so folks see that I know a thing or two about abuse and sit in enough court rooms and have spent over 30 years married to a litigator to know a thing or two"

followed by her own tweet. *Id*.

After this demand for attention and promotion, she added, gratuitously, "I am troubled by Kimberly and her attempts to take simple tweets off topic and into her own direction, but as many privately pointed out to me last night 'she is brain damaged as are many other confused

10

tweeters.'" *Id*. When Ms. Van Kooten objected to this offensive statement, Ms. de Lench defended it as "talk[ing] facts." Exhibit to Amended Complaint (Dkt. 23-9). The comments to Ms. Van Kooten help establish Ms. de Lench's egregious pattern of behavior over the course of years; without any apparent precipitant, and in response to no contact directed at her, Ms. de Lench repeatedly has attacked and impugned Ms. Archie to business associates, friends, journalists or the general public, apparently in response to Ms. Archie simply having spoken in ways with which Ms. de Lench disagrees. Ms. de Lench has made her attacks personal, addressing Ms. Archie's purported deficiencies in intellect, reasoning and morality, as well as attacking her statements about her son and his death, rather than confronting her views on topics such as CTE and brain trauma.[5]

Ms. de Lench has also made reprehensible comments to Ms. Archie directly. (Ms. Archie has not claimed these were defamatory because they were said to Ms. Archie rather than to third parties.) They illustrate the abusiveness of Ms. de Lench's conduct toward Ms. Archie and the reasons it rises to the level of extreme and outrageous. In addition to her pattern of contacting third parties, unsolicited, to discredit and defame Ms. Archie when Ms. Archie makes public statements about her son or CTE, Ms. de Lench directly disparaged and maligned Ms. Archie's work in an email message just days after Ms. Archie's son's death. She wrote, discussing her alleged help to grieving mothers and victims' families and apparently asserting her superiority to Ms. Archie, "I have never profited from them in court or other way ever. I do not troll the web for names and injury records. I refuse to be an expert witness as it is a conflict of interest and

---

[5] Even based only upon the conduct toward Ms. Archie which Ms. de Lench has admitted, it is striking that it is she, and not Ms. Archie, who initiated the above-captioned lawsuit. The thrust of Ms. de Lench's claims is that she was defamed by virtue of being falsely accused of harassing Ms. Archie via anonymous Twitter accounts. Yet Ms. de Lench has admitted statements to and about Ms. Archie easily as demeaning as any made on the anonymous Twitter accounts which Ms. Archie accused Ms. de Lench of using.

11

counter to my ethics." Exhibit to Amended Complaint (Dkt. 23-17). These were references to Ms. Archie's work as a legal consultant and were disparaging of that work. In the same email, Ms. de Lench refused to take responsibility for her own previous labeling of Ms. Archie as "brain-damaged," instead laying the blame upon a third party for failing to keep her verbal assault a secret from Ms. Archie. Ms. de Lench clearly knew that she was being disparaging in this email to Ms. Archie at a vulnerable moment, given that the context for the message was Ms. de Lench's purported condolences to Ms. Archie upon the loss of her son. On another occasion, Ms. de Lench again used Ms. Archie's son's death as a way to insult and disparage her, writing,

> "Kimberly, You are very sick. Get some help… There are a ton of people out there who are onto you. I just liked all of the person's posts and I hope whoever it is contacts me so that I can find out who they are. I have a dossier of people who have had issues with you and most are professionals in the world of mental health. Perhaps if we all get together we might figure out a way to get you the help you need so that you stop harassing and badgering all of us. <u>You're using your poor dead son to promote yourself and to escalate a few paralegal courses into posing as a 'legal expert[.]</u>' I have absolutely no time for you and lost any respect years ago,, [sic] leave me alone….you are a disgraceful pathetic sorry soul. And at the same time I will make it public that you set up a fraud twitter account and hung your chiropractor friend in Atlanta to out dry. I have a number of emails from him that I will use in a court of law to show just how sick you are….the time is very quickly approaching that we will be pressing charges[6]…Please Kimberly get yourself some help."

Exhibit to Amended Complaint (Dkt. 23-37).

The fact that this pattern of conduct toward Ms. Archie has persisted over years helps establish it as extreme and outrageous. *See Sindi v. El-Moslimany*, 896 F.3d 1, 22 (1st Cir. 2018) ("Here, the relentless nature of Samia's pernicious attacks and the duration of her onslaught weigh heavily in favor of a finding of severity" and finding sufficiently extreme and outrageous

---

[6] The claimed intent to be "pressing charges" implies Ms. Archie is being accused of criminal conduct. In addition to being disparaging and further supporting Ms. Archie's IIED claim, this is an improper threat of a criminal prosecution.

conduct where the defendant "transmitted a series of vicious and extraordinarily disturbing e-mails and text messages" and also disseminated disparaging statements about plaintiff to others.) This is because a defendant's display "over a long period time … [of] a strain of deliberate malevolence [may] easily qualif[y] as extreme and outrageous conduct." *Id*. Similarly, the pattern of conduct by Ms. de Lench is extreme and outrageous because, from the first, Ms. Archie made clear it was unwelcome. Counterclaims (Dkt. 47) ¶ 52. Despite this, Ms. de Lench continued her attacks. *See Boyle v. Wenk*, 378 Mass. 592, 595–96 (1979) (Defendant who made harassing debt collection phone calls although plaintiff was not the true debtor "did engage in a pattern of conduct which a jury could find was extreme and outrageous, exceeding mere insult or minor annoyance. [Defendant]'s conduct may reasonably be viewed as an attempt to intentionally shock and harm a person's 'peace of mind' by invading the person's mental or emotional tranquility…. Repeated harassment, such as that engaged in by [defendant], may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress…. Significantly, [defendant]'s conduct continued even after Dolores Boyle, in the first call, had told him not to call again.")

Furthermore, offensive conduct toward a vulnerable person reaches the extreme and outrageous threshold where harassment of someone else might not, especially where the defendant has targeted a known vulnerability. "Massachusetts recognizes that children and other particularly susceptible persons are likely to be more vulnerable to emotional harm" and therefore may be more able to make out a claim of IIED. *Kennedy v. Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010). This is true even where, unlike Ms. de Lench, the defendant is not aware of the precise dimensions of the affected individual's vulnerability. *See Boyle*, 378 Mass. at 596 (harassing phone calls from individual who knew plaintiff "had just returned from the

13

hospital put him on notice that she might be more vulnerable to harassment or verbal abuse" and therefore supported IIED claim against motion to dismiss). Ms. de Lench's conduct can only be seen as more culpable; she was aware of the precise nature of Ms. Archie's vulnerability – the loss of her son – and not only harassed her in spite of it, she specifically attacked Ms. Archie regarding her son's death, the source of her vulnerability. Ms. de Lench made Ms. Archie's son's death the subject of challenges to Ms. Archie's veracity and intellect, and accused her of misusing her son's death. The deliberate exploitation of Ms. Archie's grief could well be determined by a factfinder to be extreme and outrageous. Finally, Ms. de Lench's conduct is also extreme and outrageous because it has included threats of legal process – both civil and criminal – in an attempt to intimidate, silence and otherwise harm Ms. Archie. There was no basis for these threats, but the attempt to use the legal system to harm Ms. Archie only furthers the conclusion that her conduct was severe enough to be found extreme and outrageous.

Ms. de Lench then made good on her threats and compounded her ongoing abuse of Ms. Archie by filing this lawsuit and then using it to further publicly disparage Ms. Archie. Ms. de Lench has been very deliberate in her self-promotion and corresponding attacks on Ms. Archie using this lawsuit. Not only have she and Ms. Straus issued press releases about this lawsuit and used the litigation for fund-raising, they have added so-called meta tags to the press releases so that when one searches for information on the Internet about Ms. Archie and CTE – one of the areas in which she is an expert – one quickly finds news of the lawsuit. Archie Affidavit in Support of Reply to Motion to Dismiss (Dkt. 34) ¶ 10. In other words, Ms. de Lench has leveraged search algorithms to ensure that her disparaging allegations against Ms. Archie will be widely known, and will follow Ms. Archie as she tries to go about her professional life and perform her advocacy work, in the hopes of preventing more deaths like that of her son.

In addition, according to the documents Ms. de Lench attaches to the Motion, Ms. de Lench has been soliciting donations and support for her suit against Ms. Archie from an expert witness who will testify for the Pop Warner organization and against Ms. Archie in a separate lawsuit. Exhibit Z to Motion (Dkt. 51-27). While Ms. de Lench manages to spin this into a complaint about Ms. Archie somehow "attempt[ing] to interfere with Ms. de Lench's efforts to obtain the funds needed to hire outside counsel to take this matter trial" (against Ms. Archie), Memorandum p. 18, what these documents actually reveal is that Ms. de Lench is feeding disparaging claims about Ms. Archie to an individual who is supposed to testify as an expert against Ms. Archie, and soliciting that expert to assist her in promoting this lawsuit and fund raising for it. *See* Exhibit Z to Motion (Dkt. 51-27).[7] Furthermore, Ms. de Lench has behaved outrageously in contacting and attempting to ally with Ms. Archie's ex-husband against Ms. Archie. Counterclaims (Dkt. 47) ¶ 71. The attempt to align with Ms. Archie's ex-husband against her is distressing to Ms. Archie, and a factfinder could find it extreme and outrageous. All in all, Ms. de Lench's verbal assaults on Ms. Archie have been without provocation, unrelenting, vitriolic and well-coordinated. They have caused Ms. Archie substantial stress as well as expense, the loss of business, and damage to the advocacy work about which she feels passionate, each of which has further caused her emotional distress. They also threaten to disadvantage her in her litigation against the Pop Warner organization. Ms. Archie's claim for intentional infliction of emotional distress must stand.

---

[7] This lawsuit and associated publicity (and fund raising) also threaten to interfere with Ms. Archie's pending lawsuit against the Pop Warner youth football organization. This is, of course, Ms. de Lench's intent, as part of her vigorous campaign to further align herself with defenders of youth football.

### III. MS. ARCHIE HAS DEMONSTRATED HOW PROCESS WAS USED IMPROPERLY, TO HER DETRIMENT, AND THEREFORE HER ABUSE OF PROCESS CLAIM MUST SURVIVE.

Ms. de Lench's claim that her use of the process issued in this matter to further defame Ms. Archie and to raise money to pursue her claims against Ms. Archie is insulated by the anti-SLAPP statute overreaches on the concept of petitioning. Certainly, Ms. de Lench's lawsuit itself is protected petitioning activity. Apparently, Ms. de Lench hopes to protect these extrajudicial comments under the prong of the anti-SLAPP statute offering safe harbor for "any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding…." Mass. G.L. c. 231, § 59H.

However, one can exceed the boundaries of that protection. Here, that is what Ms. de Lench did when she did not just comment on her lawsuit, or answer an inquiry related to it. Instead, she created from scratch a social media campaign and fund-raising effort, complete with meta-tags designed to influence Internet search results about Ms. Archie, which was aimed at leveraging this action to damage Ms. Archie's reputation and advocacy work, and at raising money, as well as advancing Ms. de Lench's profile in certain circles. This is insufficiently related to an effort "to redress a grievance, or directly or indirectly to influence, inform, or bring about governmental consideration of [an] issue" and therefore unprotected. *Global NAPS, Inc. v. Verizon New England, Inc.*, 63 Mass. App. Ct. 600, 606–07 (2005). Like the statements in *Global*, the apparent purpose of Ms. de Lench's press releases was to spread negative characterizations of Ms. Archie and to raise money for Ms. de Lench, not to inform any consideration of an issue, or redress a grievance (which was already being addressed by the lawsuit). "Because [the statement] lacks that crucial characteristic, the case law suggests it

should not be deemed petitioning protected by the statute…. [T]he statements here were not 'mirror images' of what was said in a governmental forum, nor were they made in conjunction with any legislative petitioning." *Id*. at 607. Furthermore, "a special motion to dismiss pursuant to G.L. c. 231, § 59H, should not be granted merely because there is on-going litigation between the parties in a different forum." *McLarnon v. Jokisch,* 431 Mass. 343, 348 n. 7 (2000). Ms. de Lench's claim that her use of process to harass Ms. Archie and to fund raise appears to implicate the fundamental misconception that because Ms. de Lench has sued Ms. Archie, her conduct outside the litigation toward Ms. Archie is somehow insulated. This is a false conceit, and Ms. de Lench must be accountable for her use of process to harass Ms. Archie and for other improper purposes.

The elements of an abuse of process claim "are that: '(1) "process" was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.'" *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 407 (2002), quoting *Datacomm Interface, Inc.* v. *Computerworld, Inc.,* 396 Mass. 760, 775–776 (1986). Ms. Archie's pleading both satisfies each of these elements and alleges specific facts in support thereof. Ms. Archie has pleaded that Ms. de Lench has used the process issued in this matter to damage Ms. Archie's reputation and to fund raise, and has offered the specific example that Ms. de Lench has employed computer coding which assures that news of this lawsuit appears prominently when any third party uses a major search engine to look up Ms. Archie. Archie Affidavit in Support of Reply to Motion to Dismiss (Dkt. 34) ¶ 10. Furthermore, Ms. Archie has learned subsequently that she has lost at least one significant work engagement due to the publicity surrounding this lawsuit. Affidavit of Kimberly Archie in Support of Opposition to Plaintiff/Counterclaim Defendant's Motion to Dismiss, ¶ 3. Finally, Ms. de Lench is using the process issued in this matter for fund-raising,

which raises a host of ethical considerations.  Ms. Archie has more than facially alleged that Ms. de Lench has used the process issued in this matter for ulterior or illegitimate purposes, and has explained how these purposes expose her to both further disrepute, business loss and unfair disadvantage in this litigation.  Ms. Archie's abuse of process claim should be allowed to proceed.

|  |  |
|---|---|
|  | The Defendant/Counterclaim Plaintiff, <br> KIMBERLY ARCHIE, <br> By Her Attorneys: |
| Dated:  October 29, 2019 | */s/ Francis D. Dibble, Jr.* <br> Francis D. Dibble, Jr., BBO No. 123220 <br> Elizabeth S. Zuckerman, BBO No. 673190 <br> Bulkley, Richardson and Gelinas, LLP <br> 1500 Main Street, Suite 2700 <br> Springfield, MA 01115-5507 <br> Tel. (413) 272-6219 / Fax (413) 272-6804 <br> fdibble@bulkley.com <br> ezuckerman@bulkley.com |

**Certificate of Service**

I, Francis D. Dibble, Jr., hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on October 29, 2019.

*/s/ Francis D. Dibble, Jr.*
Francis D. Dibble, Jr.

3169700v1